## UNITED STATES v. LUCE et al.

(Circuit Court, D. Delaware. September 26, 1905.)

No. 155.

1. NUISANCE—INJURY TO GOVERNMENT QUARANTINE STATION—RIGHT OF GOVERNMENT TO COMPLAIN.

The quarantine station on Delaware Bay between Lewes and Cape Henlopen has been established and maintained by the United States for the accomplishment of beneficent ends in which the public is vitally con-

cerned; and it is a matter of great importance that neither efficiency in the administration of the station nor its usefulness in other respects should be impaired. The United States is represented at the quarantine station in the persons of its officers, agents, and servants having charge and occupancy thereof. Immigrants and other persons there detained in quarantine or confined in the marine hospital are so detained or confined by authority of the United States in the maintenance of a system intended and calculated to serve at once as an aid to commerce and protection against the invasion of the country by contagious and infectious diseases. The United States owning and holding the property for the accomplishment of these benign purposes has a right to insist that neither the efficiency of the management of the station nor its usefulness in other respects shall be sacrificed or impaired by nuisances wrongfully created or continued, and it is entitled to secure relief from such nuisances when materially and injuriously affecting the health or comfort of those in charge of or employed at the station or of those detained or confined there and to both classes of persons the government owes protection against such wrongs and the courts should not hesitate to accord it.

2. SAME—EVIDENCE.

The fish fertilizer factory of the defendants and that erected by S. S. Brown & Company are distant from the quarantine station from five eighths to three quarters of a mile, located on the shore of Delaware Bay, and so situated in relation to each other that when the wind is in such direction as to carry to the quarantine station odors from the defendants' factory it will also carry to the station odors from the other factory. The period of their operation extends approximately from July 1 to the first or middle of November, and during this period the prevailing winds are in such direction as to carry the odors from the factories to the station.

3. SAME—OFFENSIVE ODORS—EFFECT.

The evidence is full, clear and convincing that the inmates of the quarantine station are materially annoyed and discomforted by offensive, noisome and nauseating odors originating at or in the immediate vicinity of the fish factories and caused by their operation, and that such annoyance and discomfort, while not uninterrupted, occur so frequently as to interfere to an unreasonable and unjustifiable degree with the common enjoyment of life and to constitute a nuisance which should be restrained by injunction if the government be in a position to complain of it.

4. SAME—ELEMENTS—INJURY TO HEALTH.

It is not essential to the existence of a nuisance from offensive odors that they should be calculated to break down or injure health or that health should be impaired or even threatened by them. It is sufficient that they be nauseating or physically discomforting or annoying to persons of ordinary sensibilities, "interfering with the ordinary comfort physically of human existence, not merely according to elegant and dainty modes and habits of living, but according to plain and sober and simple notions among the English people." The sound condition of those employed in the fish factories and habituated to the smells necessarily generated in their operation is not determinative of this case. It is well known that persons can become accustomed to foul and noisome odors and retain their health.

5. SAME—EFFECT OF ODORS.

It by no means follows from the fact that the odors from the fish factories may not be nauseating or discomforting and annoying to those employed there, or to others inured to noisome smells, that they do not constitute a nuisance to the inmates of the quarantine station and marine hospital. It is important in this connection to bear in mind that the accomplishment of the purposes for which the station and hospital were established involves not only the presence there of the officers and employés in charge but the detention and confinement of many who have never been subjected to such a tainted atmosphere.

6. SAME—FREQUENCY OF ANNOYANCE.

The frequency with which during the period from July 1 to the early part or middle of November in each year the quarantine station is visited with the noisome smells is sufficient to constitute a nuisance there.

7. SAME—RIGHT TO OBJECT.

The doctrine that owners and occupants of houses and lands are entitled to the enjoyment of air of reasonable purity, though of general, not being of universal application, there is sometimes difficulty in applying it to a given case. Considerations affecting the social state require in some instances concessions or compromises, to a greater or less extent, of what would otherwise be regarded as of strict right.

8. SAME—MANUFACTURING NEIGHBORHOOD.

But the existence of the two factories in question does not constitute such an industrial or manufacturing neighborhood that the government is compelled to submit to the stench emanating from them. It cannot be compared to the growth and territorial expansion of the industries of a city.

9. SAME—REASONABLE USE OF PROPERTY.

The principal question after all is whether the defendants, in view of their obligation to others, are making a reasonable use of the premises occupied by them. Are they duly observing the precept, Sic utere tuo ut alienum non lædas? On the evidence and the authorities clearly they are not.

10. SAME—RIGHT TO MAINTAIN NUISANCE.

It is well settled that the mere fact that one voluntarily "comes to a nuisance" will not preclude him from complaining of and relief against it. A contrary doctrine would be so unreasonable and oppressive as to work its own condemnation. Where one operates a factory emitting foul or noisome smells and owns and controls all the land within the area traversed by them in sufficient strength to be nauseating or substantially discomforting, no one has just cause to complain. But to foist impure and disgusting odors upon others in their homes, is a different matter, and, save in localities generally devoted to a business of a character to produce such or equally offensive smells, or unless by virtue of grant, license, estoppel or prescription, is not to be tolerated.

11. SAME—INVESTMENT OF MONEY.

The fact that defendants have invested a considerable amount of money cannot clothe them with immunity for creating or contributing to and maintaining a nuisance.

12. INJUNCTION—PROPRIETY OF GRANTING—BALANCE OF CONVENIENCE.

The doctrine of the balance of convenience or injury which so frequently is determinative of the propriety of granting or denying a preliminary injunction has no application to decrees after a hearing on plenary proofs taken in due course.

13. NUISANCE—SEPARATE ACTS OF SEVERAL PERSONS—INJUNCTION.

The fish fertilizer factory of the defendants and that erected by S. S. Brown & Company on the Delaware Bay are so situated with respect to each other that when the wind is in such direction as to carry the odors from one of them to the quarantine station it will carry the odors from the other there, and the odors from one cannot be distinguished from the odors from the other. There is no evidence of co-operation, privity or business relationship of any kind between the defendants and S. S. Brown & Company in the erection and operation of their respective factories, or between the defendants and the succeeding owners or managers, if such there be, of the factory erected by S. S. Brown & Company; nor is there any evidence to the point that the odors from either of the factories alone would or would not so contaminate the air at the quarantine station as to create a nuisance there within the definition of the authorities. But the combined odors from both factories unquestionably have that effect, and in producing it the two establishments in fact

co-operate in and contribute to the creation of the nuisance. Under these circumstances, in the absence of a plain, adequate and complete remedy at law, the owners or managers of both or either of the factories can be enjoined from maintaining or contributing to the maintenance of the nuisance. The acts of several persons may together constitute a nuisance, which the courts will restrain, though the damage occasioned by the acts of any one, if taken alone, would be inappreciable.

**14. SAME—ABSENCE OF REMEDY AT LAW.**

This court has jurisdiction to award an injunction in this case by reason of the absence of a plain, adequate and complete remedy at law. The existence of such a remedy is negatived by several separate and independent considerations. Injury resulting from noisome or foul odors producing personal discomfort and annoyance is not susceptible of compensation in damages according to any approximately accurate measure, and from its recurrence would lead to multiplicity of suits. The peculiar circumstances of this case afford further support to the proposition that the United States, unless prevented by estoppel, acquiescence, or some other act or conduct on its part, is here entitled to injunctive relief. That the government, in the absence of a plain, adequate and complete remedy at law has a right to maintain an injunction bill to restrain a nuisance materially and injuriously affecting the occupancy of its own property there can be no doubt. If, as is the case, a private individual be entitled to equitable relief against foul or noisome odors rendering the occupancy of his property substantially and frequently discomforting and annoying, the government for stronger reasons is entitled to such relief against the continuous or recurrent nuisance at the quarantine station. For should the goverment resort to an action at law, it could not recover damages measured by the discomfort and annoyance suffered by the inmates of the station; and, unless the nuisance were of such intensity as to compel the abandonment of the station by the government, there would be absolutely no basis on which it would be possible even to guess at the quantum of damages. Further, in view of the fact that the nuisance has been created by both of the fish factories without concert between those operating them and with no practicable means of ascertaining what the effect of the defendants' alone would be, it is very questionable whether the government could in an action at law recover even nominal damages.

**15. INJUNCTION—PRACTICE—FINDING FACTS.**

The jurisdiction of this court to award an injunction in this case, therefore, seems clear; and, possessing such jurisdiction, it has plenary power over the suit, including the ascertainment of disputed facts. Such an ascertainment, indeed, is contemplated by the Constitution.

**16. NUISANCE—ACQUIESCENCE—ESTOPPEL—PRESCRIPTION.**

The defendants, even on the assumption that the government is proceeding in this suit in a quasi private or proprietary character, have not acquired a prescriptive right as against it to continue or contribute to the continuance of the nuisance complained of, nor has there been any such acquiescence, act or conduct, on the part of the government as to estop or preclude it from complaining of such nuisance. Mere lapse of time short of the prescriptive period cannot operate as a bar.

**17. SAME—ESTOPPEL—EVIDENCE—LACHES.**

It does not appear either directly or inferentially that the government at any time assented to or acquiesced in the operation of the fish factories in such manner as to produce or contribute to the production of the nuisance of which it now complains. These factories were not, nor was either of them, located, built or operated by the procurement or inducement of the government, nor under any promise, express or implied, on its part that no complaint would be made by it of foul, noisome or nauseating odors, emanating from the manufacture of fish fertilizer, and passing to and over the site of the quarantine station. The evidence wholly fails to disclose the essential elements of an estoppel in pais or an equitable estoppel against the government. The period necessary for the acquisition of a prescriptive right on the part of the defendants as

against the government had not elapsed before the filing of the bill in this case and such right was not and could not be acquired afterwards. It does not appear that the government was prior to the cession to it by Delaware of the site of the quarantine station in 1889 in a position, or had any right, to complain of the stench resulting from the operation of the fish factories or either of them; for there is no evidence that prior to such cession the United States had any right, title, interest or claim to or in the site of the present quarantine station and marine hospital. The law, indeed, goes further and holds that, notwithstanding the prescriptive period may have fully elapsed, no right to maintain a private nuisance is thereby acquired except as against those who have during all of that period been in such a position as to entitle them to complain of it. The acquisition of a prescriptive right by the defendants is, therefore, wholly negatived. If the unwarrantable assumption be made that the mere lapse of time short of the prescriptive period may be evidence of such laches as would bar the government, there was not, even on that assumption, such laches as to defeat this suit. The cession having been made to the United States in.1889, the buildings on the quarantine station were thereafter completed within less than one year of the commencement of this suit. Under these circumstances any imputation of laches on the part of the government is wholly inadmissible.

18. SAME—RELATIVE EQUITIES OF PARTIES.

The circumstances under which the defendants erected and have continued to operate their factory are not such as to disclose a reasonable use by them of their premises or to clothe them with an equity as against the government. Of all localities at or near the mouth of the Delaware Bay the quarantine station was erected in that most convenient and desirable for the purposes of such an establishment. The government had constructed the breakwater affording a safe and excellent harbor as well for the facilitation of the transfer of persons from vessels to the quarantine station and marine hospital as for shipping generally. It had also built a pier to the east and a life saving station to the west of the site of the fish factories and within such a short distance from that site that the erection and operation of the latter could not fail so to contaminate the air with noisome odors as frequently, if not continuously, to cause discomfort and annoyance at those government works. From the initiation of their fish fertilizer business the defendants, while availing themselves of the protection of the breakwater, have displayed a striking lack of consideration toward the government by the emission of foul and nauseating smells injuriously affecting its interests. In view of the peculiar suitability of the site of the quarantine station for the accomplishment of the beneficent and important public purposes for which the station was designed and of the establishment by the government of environments materially contributing thereto, it is clear that, on the question whether the right of the government to have uncontaminated and reasonably pure air at the quarantine station and marine hospital is not superior to any supposed right or equity on the part of the defendants in the conduct of their business to create or contribute to noisome odors substantially and injuriously affecting the inmates of the station and hospital, the case is altogether with the government.

19. SAME—ABATEMENT.

This court is strongly impressed with the conviction that unless efficient relief be granted in the present proceedings to the government from atmospheric contamination caused by the fish factories, the nuisance complained of will by gradual addition grow to such an extent as to destroy the usefulness, or compel the abandonment by the United States, of the quarantine station and marine hospital, to the serious detriment of the public interests. To assume that the government should be forced to acquire by purchase or condemnation all the territory within the sphere of operation of the nuisance created by the fish factories is unwarranted by the authorities and a palpable absurdity.

(Syllabus by the Court.)

William Michael Byrne, late U. S. Atty., and John P. Nields, U. S. Atty.

William Findlay Brown and William S. Hilles, for defendants.

BRADFORD, District Judge. This suit is one of long standing and should have been disposed of several years ago. It has been elaborately and exhaustively argued by counsel in all its phases and has also been reargued on some points. It was brought by the United States against Edward Luce, James V. Luce and Edward C. Luce, trading as Luce Brothers, for the abatement or suppression of an alleged nuisance. The bill, as amended, prays in substance for an injunction restraining the defendants from further prosecuting their business of manufacturing oil and fertilizers from fish at their factory on the share of Delaware Bay near Lewes, in this district; or, alternatively, from so prosecuting their business there as to allow offensive odors from their factory premises to reach the quarantine station of the United States on the bay shore which is between five eighths and three quarters of a mile to the east of the factory; or causing annoyance to the inmates of the station by flies drawn to or generated on the factory premises and blown to or upon and over the station; or causing such noise by steam whistles or by men and appliances used in unloading the defendants' boats as to break and disturb the sleep and rest of the inmates of the station; or from so using their factory premises as to injure the United States in the use and enjoyment of the station; or from allowing refuse liquids to pass from those premises to and upon the station. Concurrently with the bringing of this suit the United States also filed an independent injunction bill against Samuel S. Brown and James Lennen, trading as S. S. Brown & Company, which, as amended, prays similar relief against the defendants therein, whose factory was and is in the immediate vicinity of the factory of the defendants in this suit. Evidence was taken in the suit against S. S. Brown & Company which by stipulaiton of counsel "is applicable to and shall be used not only in this case, but also in the case of the United States v. Luce Brothers, the same as if the said testimony had been taken for each of said cases respectively." While the term "testimony" is used in the stipulation, it was evidently intended to embrace, and has been treated in the presentation of the case as embracing, all the evidence, whether written or oral.

It appears from the evidence that the defendants and S. S. Brown & Company erected their respective factories in the spring and summer of 1883, and that the same were in operation in the summer of that year, and have since continued to be operated during the fishing season in each year extending approximately from July 1 to the early part or middle of November. The premises on which the two factories are located were leased by the town of Lewes to the defendants and S. S. Brown & Company for the purposes of their business, and are distant about a mile and a quarter or a mile and a half from the built up portion of the town. At the time of the completion and operation of the factory of the defendants and that of S. S. Brown & Company in 1883 no building had been erected on the

site of the present quarantine station and there were within the distance of about a mile from those factories two dwelling houses and a life saving station of the United States; and it is fairly to be inferred from the evidence that there was at that time no other house or dwelling within that distance. One of the dwelling houses was on the bay shore about one third of a mile to the east of the factories and was occupied by Andrew H. Baker. The other dwelling house was on the bay shore about or possibly a little more than a mile to the west of the factories and was occupied by Levin D. Lynch. The life saving station was about half a mile to the west of the factories and in charge of John A. Clampit. The testimony of these witnesses relative to some of the results of the business conducted at the factories at or a short time after they were first operated is instructive. Baker, a witness for the government, testifies:

"Q. 4. How long have you been living there? A. I have been living there thirty years next spring. I think it was in 1868 when I built my house. Q. 5. Have you at your residence at the place mentioned experienced disagreeable odors, and, if so, where did those odors come from? A. I cannot hardly tell what kind of a smell it is. Q. 6. What effect did it have upon you? A. Sometimes it would be apt to make me sick and qualmish. Q. 7. What effect did it have upon the members of your family? A. The same as on myself. Q. 8. How long have you and your family suffered from these disagreeable odors that you speak of making you qualmish and sick? A. I don't know about what you call suffering. You mean how long. As long as the fish factories have been there. * * * Q. 16. Have you been made sick during the last summer? A. I have been made feel qualmish. Q. 17. And that has been your experience during the summer since these factories have been there? A. Pretty nearly all; all but the first summer, and that made me actually sick so that I vomited—that is, the first year or two. There might have been two years before I got used to it. Q. 18. Have you ever been used to it to such an extent that it would not make you feel qualmish? A. It always made me feel qualmish. Q. 19. It always made you feel qualmish? A. That is, when the wind blows right at me. Q. 20. If the wind passed your place, would that be in a direct line for it to pass over the quarantine station? A. Just about the same. It is on the same line; just about the same line, east and west."

Lynch, a witness for the defendants, with respect to the odors from the fish factories, testifies:

"XQ. 72. You don't complain yourself? A. It did smell sometimes, when I have been down there. I thought I could not stand it when I first went down there, but the longer I stayed the better I liked it. XQ. 73. You got used to it? A. Yes, sir; I got used to it. XQ. 74. Did it make you sick when you first went there? A. No, sir; not at all. XQ. 75. It didn't affect your stomach? A. Not a bit. XQ. 76. But the longer you stayed in it the more used to it you got? A. Yes, sir. When you first go into it you feel as though you could not stand it hardly."

Clampit, a witness for the government, testifies, among other things, as to the effect of the odor from the fish factories at or in the immediate vicinity of the life saving station:

"XQ. 47. How did it affect you? A. It affected me the same way as a person having a sick stomach—caused me to throw up. Sometimes I would be at the table, and I would get up from the table and come out and get a whiff of that odor, and I would then lose my meal. XQ. 48. Did you ever vomit before you came out? A. Came out from my dinner? XQ. 49. Yes. A. I have been almost ready to vomit when I went in the room to the dinner table, and I would see the dinner table fearfully full of flies. XQ. 50. Are you troubled with dyspepsia at all? A. No, sir. XQ. 51. How long did

that sickness continue? A. Sometimes it continued for half an hour—that sick stomach, until I would take something to get clear of it. * * * XQ. 100. Did it have the same effect on the other people in the station as it had on you? A. I have seen some of them very sick."

In 1885 John W. Luce and Frank Luce were indicted and tried in the court of general sessions for Sussex County, Delaware, for an alleged common or public nuisance in maintaining and operating the fish factory of the defendants in this suit. State v. Luce, 9 Houst. (Del.) 396, 32 Atl. 1076. There was a verdict of acquittal. Chief Justice Comegys, however, in charging the jury, said:

"The indictment charges that certain noxious and offensive odors arose out of the manufacture carried on by the defendants, and that the people of the said neighborhood and passers along the respective highways were subjected to the noisomeness and offensiveness of those odors, to their great damage and common nuisance. * * * There must be proof that the manufacture at their factory, under the circumstances, operated a nuisance. From what has been proved in this case, I feel safe in saying that the manufacture of fish into scrap as a fertilizer is a nuisance per se—that is, of itself; as it involves, for its successful operation as conducted in this case, the exposure to the outside air of the refuse bone and flesh, that it may become dry. This requires more or less time, during all of which there is emitted an offensive odor. It is not that of boiling the fish; that has its own special smell, which it is to be presumed is not very offensive and is not sufficiently strong to pervade the air for a considerable distance; but it is that of the exposure of the scrap to the sun and air, which diffuses for long distances, as the evidence shows, an odor of fertilizers—one very offensive and disagreeable to people not accustomed to it."

The verdict in the above case by no means indicates that the odors emanating from the factory were not of a character calculated to prove offensive, nauseating or discomforting to those not accustomed to them or other foul or noisome smells, but that the jury was not satisfied that they affected such a number of persons as it was necessary, under the charge of the court, should have been affected, in order to warrant a finding that a common or public nuisance was maintained. It may fairly be assumed that such was the ground of the verdict in view of the following language in the charge:

"If the odors do not reach a populous neighborhood or do not pervade the traveled highway there is no damage to any portion of the public and no indictable nuisance. You see at once, then, that upon the theory that this trade or business was necessarily one attended, by bad smells, stinking odors, impregnating the air with foulness, so as to render existence uncomfortable and disagreeable, yet unless they reached the nostrils of the people of the neighborhood of the factory there cannot be said to be any violation of law. When, with reference to an alleged nuisance, the people or citizens of a neighborhood or the public are mentioned, it does not mean all the people, or of the public, but only such considerable number of them as to show that more than a few merely are meant. No general definition can be given to denote precisely what is meant by 'few' or 'many,' nor can any be precisely given of the limits expressed by the term 'neighborhood.'. It is sufficient to say of the latter term that in case of an operating nuisance, every part is in the neighborhood which is affected by it. 'Few' and 'many' are to be considered with reference to the surroundings. If there is a nuisance affecting a place and a very small number only are victims of it, it would be an injury to but a few: and while they would have their separate actions for compensation in damages for the injury, there would be no public evil for an indictment. * * * The term 'public' does not mean all the people, nor most of the people, nor very many of the people of a place; but so many of them as con-

tradistinguishes them from a few. Now, the question in this case in this: Was any considerable number of the people of Lewes, or of those who passed and re-passed along the highway of the bay shore and the bay itself, subjected from time to time to the discomfort of noxious, fetid air, unpleasant odors, by reason of the operations carried on by the defendants at their factory? If there were, then the defendants are guilty under this indictment and should be so found; otherwise they should be acquitted."

The criminal proceeding above referred to is in no sense determinative of the case before this court. It is, however, suggestive by way of contrast. There, the state proceeded by criminal prosecution to punish an alleged offense against the public. Here, the government pursues a civil remedy to secure redress for an alleged wrong or injury to it in its quasi private or proprietary character, although in a matter affecting the general welfare. There, the case principally concerned the inhabitants of Lewes, a mile and a quarter or more away from the defendants' factory, and in such a direction that the prevailing winds during the period of its operation carried its odors away from and not toward the town. Here, it involves the condition of things at a point distant from the fish factories only from five eighths to three quarters of a mile, and so situated as necessarily to be subjected frequently to such odors owing to the direction of the prevailing winds during such period. It further appears that since the facts transpired on which the above mentioned prosecution was founded the factory of the defendants, as well as that erected by S. S. Brown & Company, was materially enlarged. The defendants in their answer to the amended bill admit that "during the years 1884 to 1888 defendants spent large sums of money in the improvement and extension of their works amounting to eight thousand dollars at least." A similar statement is contained in the answer to the amended bill in the suit of the United States v. S. S. Brown & Company. The foregoing considerations widely differentiate this suit from State v. Luce.

It appears that the first building on the site of the quarantine station was a marine hospital erected by the government in 1884. There is nothing in the evidence to show whether the United States had at that time acquired, or whether it did prior to the cession hereinafter mentioned, acquire any right or title to the ground on which the hospital stood. The state of Delaware, however, by virtue of an act of assembly passed April 12, 1889 (18 Del. Laws p. 549, C. 449), and proceedings had pursuant thereto, ceded to and vested in the United States in perpetuity the land included in the quarantine station and "all claim, title and right of soil and jurisdiction of the State of Delaware, in, to or over the same," subject to a certain reservation of jurisdiction touching the service of civil and criminal process, upon the express condition that a quarantine station "shall be located and maintained thereon by the United States." Upon the land so ceded the existing quarantine station was established, and provided with buildings, furniture and appliances suitable for quarantine and hospital purposes and in other respects adapted thereto, at a total cost including the old marine hospital of from $50,000 to $55,000. The work was completed in the latter part of 1893, after having been in

progress several years. The evidence is to the effect that the station is well equipped and admirably located. Dr. Henry D. Geddings, past assistant surgeon in the marine hospital service of the United States, who was in charge of and resided at the station from July 1, 1893, to September 16, 1893, testifies:

"The Delaware Breakwater Quarantine Station and Marine Hospital was established for the protection of the city of Philadelphia, and other cities situated on the Delaware Bay and River,' against infection, by importation through shipping. of contagious or infectious diseases, which might be a menace to the health of the people of the United States. It served every purpose for which it was intended during my residence there. * * * At that time it was the most complete quarantine station, either national or municipal, in existence in the United States. I was well acquainted with other quarantine stations and make this statement from comparison. There were a residence, an executive building, hospitals for contagious and non-contagious diseases, bathhouses and laundry, barracks for the accommodation of one thousand immigrants, fully fitted with all the necessary bedding and appliances, the most approved apparatus for cooking for such a number of immigrants, and an artesian well, which furnished an abundant supply of pure water, and apparatus for the steam disinfection of clothing, bedding, etc.; also, apparatus for the application of disinfecting solutions."

Samuel W. Richardson, who was hospital steward and executive officer of the quarantine station from July 26, 1893, to December 11, 1893, testifies:

"Q. 74. You spoke about the facility of this site for the purposes intended and the easy access to vessels coming there. State whether, of your own knowledge, you know that the quarantine station is well located for inspecting vessels coming into the Delaware Breakwater bound in any direction? A. In my personal opinion the station is admirably located for that purpose, because vessels coming in between the capes can be immediately sighted, and those that report to the Breakwater for orders generally drop anchor and display the quarantine flag calling the inspection officer. Q. 75. Have you ever had any difficulty in going from or landing at the usual landing place of the quarantine station when going to or coming from the inspection of vessels? A. No, sir; not to my knowledge, and I have been outside in the heaviest weather. Q. 76. Then, has this station a safe landing place there? A. Yes, sir; it has a good landing place—a good beach landing, and it also has the use of the large iron pier. Q. 77. You mean the Government iron pier? A. Yes, sir; the Government iron pier. The anchorage inside of the breakwater is perfectly safe, I would say, in almost any weather."

The quarantine station has been established and maintained by the United States for the accomplishment of beneficent ends in which the public are vitally concerned; and it is a matter of great importance that neither efficiency in the administration of the station nor its usefulness in other respects should be impaired.

The defendants, in conducting their business, take the fish from their fishing steamers; convey them into their factory, put them into tanks and boil them in water; and draw off the water and subject them to hydraulic pressure to extract the oil and water from them. The residuum of the fish, or fish scrap, is either treated with sulphuric acid, run through cylinders for thorough mixing and then placed in heaps, or it is spread on a platform or other surface to be dried by the sun. In practicing the latter method the fish scrap is turned over three or four times a day to facilitate drying. The former method,

by which acid is applied to the scrap, is principally pursued. The water containing the oil extracted from the fish is drained into tanks and the oil rises to the surface and is secured as far as practicable. The refuse liquid, to the amount of one hundred and fifty barrels a day, consisting of water impregnated with such of the oil as cannot be secured, and other drainage from the tanks, is emptied or run into the bay. The factory erected by S. S. Brown & Company is operated in a similar manner. It may fairly be assumed that the two factories are about equal to each other in capacity, as it appears that the cost of each was equal to that of the other, and that the value of the product of each is about equal to that of the other. The factory of the defendants and that erected by S. S. Brown & Company are so situated in relation to each other that when the wind is in such direction as to carry to the quarantine station odors from the defendants' factory it will also carry to the station odors from the other factory. Dr. Geddings sent August 17, 1893, an official communication to the board of health of Lewes as follows:

U. S. Marine Hospital Service,
Delaware Breakwater Quarantine
Station, Delaware, August 17, 1893.
To the President of the Board of Health, Lewes, Delaware:
Sir:—I have the honor to invite your attention to the fish-rendering establishments on the beach between Lewes and this station. They are a nuisance, and I consider them prejudicial to the health of the residents of this station. I have to request that immediate steps be taken for their suppression. Please acknowledge the receipt of this communication.
Yours respectfully,
H. D. Geddings,
P. A. Surgeon, M. H. S.
In Command.

The members of the board of health replied August 25, 1893, saying among other things:

"Whereas, We, the undersigned members of the Board of Health, have this day visited the fish-oil factories on the beach, and of which complaint has been made by H. D. Geddings, Surgeon in command, U. S. Quarantine Station, Delaware Breakwater; therefore Resolved, that this Board, after having visited the factories of S. S. Brown & Company and of Luce Brothers this a. m., and having made a thorough examination and inspection of the same, conclude and report that the factory of S. S. Brown & Company is in as perfect sanitary condition as it can well be kept, and that the factory of Luce Brothers is also in good condition, except the tramway is not as clean as it should be, which defect they promise to remedy immediately; and it is the opinion of this board that, while the odor arising from them is at times offensive, they are unable to find anything about them which is, in their judgment, a menace to the public health. The board further find all the men employed about these factories, some of which have been in the business for thirty years and upwards, are in perfect health, hearty and robust. From the above facts we conclude that the factories are not unhealthy, and that we see no reason why the works should be condemned as a nuisance."

The counsel for the defendants have laid much stress upon the above report. It, however, does not help their case. It is not essential to the existence of a nuisance that it be injurious to health. The sound condition of those employed in the factories and habituated to the smells necessarily generated in their operation cannot be determinative of the proper decision of this case. It is well known that persons

can be accustomed to foul and noisome odors and retain their health. With respect to the fish factories the board admitted that the odor arising from them is at times offensive; but it did not state how offensive nor how often offensive. Nor did the board visit the quarantine station to ascertain the condition of things there. The minutes of the Lewes board of health show that July 29, 1895, the secretary reported a complaint received from Dr. Wertenbaker, hereinafter referred to, against the fish factories; that a committee of three was "appointed to go over and inspect them"; that July 30, 1895, a majority of the committee made a report, which was adopted by the board, as follows:

"We have just returned from an examination of the fish manf. of Luce and Brown of Lewes Beach and find all the employees in said manufactory in good health, and found nothing unusual in the condition of these manufactories."

This is in substance similar to the report of August 25, 1893, previously mentioned, and requires no independent consideration. It is sufficient to say, in passing, that it does not appear that either the board or the committee visited the quarantine station.

A careful examination and analysis of the evidence will show almost, if not quite, to a moral demonstration that the operation of the fish factories has produced a condition of things at the quarantine station which should not be tolerated if it be possible legally to prevent its continuance. Samuel W. Richardson who, as before stated, was hospital steward and executive officer at the station from July 26, 1893, until December 11, 1893, testifies with reference to that period:

"The odor from the factories was almost over-present, and at times was almost overpowering—the odor of decaying fish. It nauseated and rendered ill not only myself but members of the family. Q. 27. Members of your family? A Members of my family; yes, sir. And at times the men who were employed upon the station. They complained of it bitterly when the wind was from the factories towards the station, that it took away their appetites and made them sick, and that they could not work. * * * Q. 29. State how many times you have been nauseated by it yourself? A. I could not state the exact number of times, but it was quite a number of times. It was not an isolated case at all, but almost, I might say, a daily occurrence when the wind was from that direction, and the flies would come down upon us in swarms. Q. 30. Where from? A. From these fish factories; and actually the sides of the building and the wire screens they were to such an extent that they almost, at times, obstructed one's view through them (the screens). * * * Q. 37. What makes you say they came from the defendants' factories? A. There was no other place in the neighborhood that would breed those flies, and they were there in immense quantities. * * * Q. 39. Did they disturb the food or water supply of the people at the quarantine station or reservation? A. It was impossible to leave food exposed at all, or even for a short period. * * * XQ. 127. Were the odors of the fish there when the flies were not there? A. If the day should happen to be still and murky or sultry, and not much air stirring, the odor of the factories was very intense even if the wind did not happen to be in that direction. XQ. 128. Then the flies were not there only when the wind drove them there? A. No, sir. XQ. 129. How many times from July 26th to December 11, 1893, were the flies there? A. That I could not tell you. I did not count them. XQ. 130. You could guess once or twice? A. They were there more than once or twice or a half dozen times or a dozen times. It was a frequent occurrence, two or three times a week, or more."

The witness further states that during the time he was at the quarantine station the prevailing winds were from the direction of the fish factories. David C. Blake, who was acting hospital steward at the station at the time of giving his testimony September 4, 1895, and had been such since September 1, 1893, testifies with respect to the odor from the factories:

"Q. 13. State your experiences, then? A. My experience has been that it caused me to become sick and nauseated a great deal of the time. It is impossible to eat your meals. Q. 14. Why? A. On account of the odor. Q. 15. Where from? A. From the fish factories. Q. 16. What kind of odor? A. It would be hard to explain. Q. 17. Is it an odor of flowers or an odor of fish? A. An odor of fish—decayed fish. Q. 18. Decaying fish? A. Yes, sir; decaying fish. Q. 19. What is the effect, as you have experienced it yourself, and seen the effects upon others, upon that quarantine station of this odor? A. As I said before, it is nauseating to such a degree that it makes a person sick Q. 20. Caused them to vomit, when you say nauseating? A. Yes. Q. 21. Have you had that experience? A. Yes, sir; on several occasions. Q. 22. What part of the time, since you have been there up to the present, has this difficulty existed? A. More so in the months when the factories are in operation, but, as a general rule, the odor is there the year round, continually—that is, when the wind is from the westward. Q. 23. What effect has it upon the atmosphere—the air you breathe? Does it render it pure or impure? A. Very impure. * * * Q. 40. Have you ever seen other persons upon the quarantine premises or reservation made sick by this odor? A. Yes, sir. Q. 41. Have you ever seen it interfere with the meals of employees or persons upon said reservation? A. I have; yes, sir. Q. 42. Is this of frequent or infrequent occurrence? A. I should judge it was on an average of about six or seven times a month. * * * Q. 45. What have you to say with respect to the flies on this quarantine station? A. The flies are so numerous that they get on the screens of the windows in such numbers that it really darkens the rooms. * * * XQ. 99. Then it has had no very bad effect upon your health? A. Only to make me sick at times when the smell would be overpowering. XQ. 100. How long would that effect last? A. It would last as long as that overpowering smell was there. XQ. 101. How long was the overpowering smell there? A. It was there sometimes two or three days. XQ. 102. Would you be sick all that time? A. I would be what I might say not sick really, but it would be nauseating. XQ. 103. It was simply disagreeable; that is what you mean, is it? A. Disagreeable, and make a person have a very bad feeling."

Dr. William P. Orr, who was acting assistant surgeon of the United States marine hospital service in 1892 and 1893 and until November 1, 1894, and in that capacity visited the quarantine station every day, testifies:

"Whenever the wind would blow from the direction of the fish factories, I could smell the odor. There is no doubt in my mind that it came from the fish factories. Q. 13. Was it an agreeable or a disagreeable odor? A. Disagreeable. * * * Q. 19. What do you know about the flies that infested this place from that factory? A. Whenever the wind blows from the direction of the factories the flies are always very thick. Q. 20. Very thick? A. Yes, sir. Q. 21. Infested the quarantine station? A. Yes. All over all the buildings. I mean around all the buildings. * * * XQ. 34. In your opinion, are the odors from these factories injurious to health—your opinion, from your observation of men and people that you know who have been there, and worked there, are these odors injurious to health? A. I do not believe that they are injurious to health except to those people—and there are quite a number of them around Lewes—who are continually annoyed by the scent from the factories and the worry to which they are subjected by it. Not from the scent itself, I do not believe, but simply be-

cause they believe that it affects their health, and they worry, and it produces, or causes, I must say, I think an injury to their health. You understand me. I do not think that the odor is injurious, but I think that there are people who are affected by it simply because they are annoyed so much by it. * * * RQ. 70. You stated that these odors from this factory were not, in and by themselves, injurious to health. If people otherwise in good health. are made sick at the stomach and vomit by reason of them and are unable to eat their meals, are the odors of a character in which you would be willing to quarantine sick people? A. No. I would not want to quarantine sick people in such an odor as that, of course. I would want to avoid it. RQ. 71. Do you think the odor that you have experienced from these fish factories is of a character that you would want to quarantine patients in if you could avoid it? A. No, I would not."

John A. Clampit, who at the time he gave his evidence lived in Lewes, and, as previously stated, had formerly had charge of the life saving station for a number of years, testified:

"Q. 8. While upon that reservation, have you ever experienced any odors from the fish factories, and if so, state their nature? A. I have experienced them, I was going to say, a thousand times. Q. 9. I mean at the quarantine station and on the reservation? A. Whenever I went there or about there and the wind was from the northwest or westward I would experience those odors. Q. 10. And what was their character and degree? A. So far as the degree was concerned, I could not tell you, but the character was terrible to me. It sickened my stomach, but in what degree it was, I could not tell you. Q. 11. I mean by 'degree' was it very bad, or not? A. It was terrible to me. Q. 12. What did those odors come from? A. They came from the fish scrap."

Clampit's testimony as to the nauseating effect of the odors from the fish factories upon himself and other persons at the life saving station has already been referred to. Dr. Wertenbaker, past assistant surgeon in the marine hospital service of the United States, who was in command of the quarantine station from September 1, 1894, to the date of giving his evidence, testifies:

"Q. 4. What have you to say, during the time you have been there, with respect to the odors alleged to emanate from these fish factories? A. The odors are unquestionably there, and have been ever since I have been there. Q. 5. And what are the odors? A. It is the odor of decaying fish. Q. 6. Where do they come from? A. They come from the neighborhood of these fish factories. Q. 7. What effect do they have upon the people at the quarantine station from your own observation? A. They are very disagreeable at all times. At some times they produce nausea and vomiting. Q. 8. Have you seen people under your charge there sick from it? A. Not the patients, but the employees and my own family. Q. 9. You have seen the employees and your own family sick from it? A. I have, and I have also been nauseated myself. We have to close the windows on that side of the house. Q. 10. Is that effective, even if the windows are closed? A. It is not effective, but it is the best we can do. Q. 11. It helps some? A. It helps some. Q. 12. Do you know anything about the alleged influx of flies from these factories to the quarantine station? A. When the factories commence operations, within a very short time afterward there are vast swarms of large, green flies that make their appearance. * * * Q. 20. What makes you say that flies of that kind, and those flies came from those factories? A. Because, in the first place, they make their appearance in greater numbers immediately after the factories commence operation. In the second place, in passing the factory you will find everything in the neighborhood covered with these large green flies. * * * Q. 73. State in your own way, from your experience there, the effect of these factories with regard to being injurious or deleterious upon this quarantine station? A. I consider the presence of the fish factories, with their flies and the odors, are distinctly a menace to

public health and that we cannot maintain an effective quarantine under the circumstances. I think it would be far wiser for the government to confiscate and destroy, paying all damages, than to let them remain there. It would be cheaper, many times cheaper, in the end. * * * XQ. 83. That is all. There is no material damage done by the odors? A. No. I do not know that they have ever produced a case of disease, but they are unquestionably very disagreeable, and, as I say, may produce nausea and sickness, but no permanent injury. XQ. 84. So that the real source of danger in your opinion, and the real source of damage to the quarantine station and its workings, is from the flies? A. Largely in the flies. Not entirely, but largely. XQ. 85. What other? A. The odors must be taken into consideration too. You must consider the fact that so far as the damage done to the quarantine by the odors is in itself not very much; but at the same time when you put sick people as well as well people into those odors, and have them nauseated by them, you cannot eliminate them possibly in making up your sum total of the damage done to the quarantine station."

Alice G. Wertenbaker, wife of the preceding witness, who was with her husband at the quarantine station, testifies:

"Q. 4. Have you ever suffered from the odors, and if so, state how? A. I have suffered sometimes from the odors. They are most disagreeable and very sickening, and when they are very strong they cause nausea, most decidedly. Q. 5. Have you ever been made sick by them? A. I have frequently. Q. 6. Have you been prevented from eating your meals? A. Yes. XQ. 7. You notice the odors more strongly when the wind is blowing from that direction than you do at other times? A. Certainly, sir. XQ. 8. Very much? A. It varies at times. One could not be sick all the time. It is only when it is very strong that one is made sick of it. XQ. 9. Then there are long periods of time when you do not notice it at all? A. No. Not long periods. It comes quite frequently. XQ. 10. How often? A. I could not tell you how often. XQ. 11. How often in the course of a month have you noticed these odors so strong as to create nausea? A. That would be impossible to tell. XQ. 12. You could not tell that? A. No. XQ. 13. Then they were not sufficiently effective to attract your attention, or you would remember it? A. Yes, indeed they are. That is not it at all. The odor is constantly disagreeable. We can stand it without having it make us sick constantly, of course. One could not live there if it was not so, but it is frequently so that one is quite sick, so sick that they are miserably sick. RQ. 14. How many days, on an average, of the week will you be reminded of the existence of these fish-house factories by the odor? A. Probably we would have one bright day with the wind blowing in that direction, and we will not notice it so much; and probably the next day it will be unbearable. The next day might be very still and the wind favorable, and it would not be so noticeable, and then, again, the day after that it would be terrible. RQ. 15. You have the odor half the time? A. Half the time the odor is there. RQ. 16. And you say you have been made sick by these odors? A. Yes, sir. RQ. 17. And have been prevented from eating your meals? A. Yes, sir.

Dr. Henry D. Geddings testifies:

"While stationed on the Government reservation there was extreme annoyance from bad-smelling odors, flies and noise. * * * The odors were disagreeable in the extreme, very oppressive, even nauseating. * * * At least three or four times a week we suffered from the noise consequent upon the discharge of these cargoes of fish, and from the bad odors arising from the rotten fish we suffered continuously, these odors producing discomfort, frequently nausea and vomiting. * * * The chief annoyance was from the odors mentioned, and I have answered that they came from decomposed fish unloaded at the wharves of these factories. In my opinion, it was about as bad as it possibly could be, and this stench arising from said cause existed not alone during the night, while they were unloading the cargoes, but was continuous during the day as well. * * * The annoyance

from flies was a very serious one. They came from these decomposing fish and from the fish scrap into which these fish were converted. They were literally in swarms. The flies were so thick that it became necessary to screen every window at the station, being over seventy in number, in the buildings occupied, and the swarms of flies were so thick that they would cut off the view through these windows and screens. This annoyance from flies continued during my entire residence there. * * * There is no doubt about the origin of said odors and flies, the same being caused by the de-composing fish at the factories, as heretofore stated, and the business carried on at the factories gave rise to said odors and flies, as heretofore answered. * * * I was frequently made sick by the odors arising from the decomposed fish coming from said factories. * * * My wife and child were made sick in the same way; my hospital steward was also made sick in the same way—that is, I have seen him sick, made sick from these same odors from these fish factories; the nature of the sickness was nausea, vomiting, loss of appetite and general depression and a feeling of debility. * * * I saw the Surgeon General of the United States, and Surgeon Austin, of the Marine Hospital Service, who were temporarily at the station on a visit of inspection, made sick in the same way and from the same causes. * * * It was impossible to keep the odors out of the executive and other buildings, and almost impossible to keep out the flies. When the wind was blowing from the factories all the window sashes would have to be shut tight, and all the window openings screened, and with all these precautions the success was only partial as to keeping out the flies and utterly unsuccessful in keeping out the odors. * * * The odors and flies would be co-operating causes for the spread of contagious diseases. * * * If the flies and odors arising from said factories continue as they did while I was there, they are a direct menace to the usefulness of said quarantine station and hospital."

Horace Willard, who was employed at the quarantine station as engineer from January, 1895, and was such at the time of giving his testimony in April, 1896, testifies:

"Q. 5. How long have you been employed by the government at the quarantine station? A. Three years in all. Q. 6. Have you ever experienced any odor while on the quarantine station, and if so, describe it, and where it came from, if you know? A. Yes, sir; I have. It comes from the two fish factories right above the iron pier, about three-quarters of a mile, I guess, from the station—the reservation. Q. 7. What is the nature of the odor as you experience it on the reservation? A. Carrion, as near as I can tell. Q. 8. Is it agreeable or disagreeable? A. Very disagreeable. Q. 9. What effect does it have upon you physically? A. It makes you sick; you can't eat anything half of the time. Q. 10. How frequently do you have this odor? A. Whenever the wind is onto the station. Q. 11. From the factories? A. From the factories; yes, sir. Q. 12. Have you experienced it within the past six or eight months? A. Yes, sir; I have experienced it all last summer, and here lately when they were loading the vessels with scrap—about two weeks ago. Q. 13. Is it as bad in the fall and winter as when they are working there in the summer? A. No, sir. Q. 14. How is it in the winter and fall? A. In the winter and fall it is kind of a dead smell, it is not strong like it is in the summer, while it is in full blast. Q. 15. But even in the winter and fall, is it agreeable or otherwise? A. It is disagreeable when the wind is blowing towards the station. Q. 16. And even in the winter and fall does it have that sickening effect that you speak of at times? A. It does. Q. 17. Have you experienced that during the last winter and fall? A. This last winter, about the first of December. Q. 18. Have you perceived the odor on the reservation from these factories since December? A. Yes, sir; two weeks ago, when they were loading the scrap. Q. 19. And then it was very disagreeable? A. Yes, sir. * * * XQ. 71. You say that these odors which you experienced made you sick? A. They have done so; yes, sir. XQ. 72. When did that happen? A. Last summer. XQ. 73. Did it happen more than once? A. Yes; several times in that hot weather—hot days. XQ. 74. Were you very sick? A. I was not so sick but what I could work. XQ. 75.

You were not so sick but what you could work? A. No, sir; but I was sick. I was uncomfortable. XQ. 76. Were you so sick that you could not eat? A. I ate a little. XQ. 77. You never stopped eating at the time? A. You can't work when you can't eat. XQ. 78. You could do that work and eat, notwithstanding your discomfort? A. Yes, sir; but then it was miserable. It was not fit for anyone to be around."

Dr. Wertenbaker, who had given evidence in September, 1895, being examined in April, 1896, testifies:

"Q. 3. Since then and up to the present time, what have been your experiences, pleasant or disagreeable, with respect to the odors from these fish factories? A. Several times during the winter we have experienced very unpleasant odors from the factories; in fact, whenever the wind is from the factories toward the station, we get these same disagreeable odors that we have had all the time. Q. 4. You are not troubled with the flies in the winter? A. There are no flies in the winter. Only last Monday the odors from the factories were very disagreeable. It was one of the warm days of spring, with the wind from that direction. * * * Q. 7. Tell whether it was fit to live in or not? A. No, I do not think so. I should not care to live in that sort of atmosphere always; it would be decidedly disagreeable. Q. 8. Uncomfortable? A. Uncomfortable. The odor of decaying fish in the nostrils all the time is very far from comfortable, or conducive to health. * * * XQ. 22. But you think that always when the wind was from that direction you experienced it? A. We get them at all times when the wind is from that direction. * * * XQ. 23. What is its intensity compared with these summer odors? A. It varies with the day, with the wind and the atmosphere generally. If it is a warm, damp day and the odors cling, of course it is stronger than it would be otherwise. XQ. 24. Since you last testified, the factories have not been in operation, have they? A. I could not tell you. I do not know whether they had closed down or not at that time in September. XQ. 25. Then, briefly, I understand you to say that you have observed no flies, but you detect the same kind of odors winter and summer? A. Same kind of odors. XQ. 26. All the year round? A. All the year round, but they have varied in their intensity. XQ. 27. And frequency? A. And frequency and peculiarity. Some days it may have a peculiar, more decayed fish odor that at others, but they are always nauseating."

Edmund B. Frazer, who was secretary of the state board of health from 1884 until after the giving of his evidence in May, 1896, testified to the effect that he was requested by Walter Wyman, surgeon general of the marine hospital service, August 12, 1893, to inspect the fish factories, and also the marine hospital at the quarantine station; that he accordingly visited the marine hospital and was taken into the office of the surgeon; that the windows on the outside were so thickly covered with flies that it was necessary to have an artificial light in the office to see; that he could not see out of the window; that the windows were shut and he did not particularly notice any odor in the house at that time, but observed an odor outside of the building; that "it smelled to me like a rotten egg when it is broken"; that he visited the fish factories, the odor there being the same odor that he had noticed while at the quarantine station. The witness further states that in June, 1895, at the invitation of Dr. Wertenbaker, the surgeon in charge, he visited the quarantine station; that on that occasion he did not smell anything at that point, but that he went out with Dr. Wertenbaker in his boat, and when in the bay opposite the marine hospital "we smelled the odor very perceptibly—very strongly." He further testifies:

"Q. 47. When you got in the line of the wind from these factories, in pursuit of Dr. Wertenbaker's duty there as a quarantine officer, you struck this odor? A. Yes; it was bad—very bad. The physicians didn't know what it was. Dr. Wertenbaker said, 'That is what I have got to put up with all the time.' Q. 48. You recognized it as the same odor you experienced when on the Reservation down there when Dr. Geddings was there? A. Yes, sir. Q. 49. With the odors that you experienced when you were down on the reservation, and the flies that you saw there in connection with your long experience as a health officer, is it possible in your judgment to maintain a proper quarantine station and marine hospital there, subject to these discomforts? A. No, sir; it is not. * * * XQ. 136. You can't control the direction of the wind? A. No. Of course, if that odor was coming there, while it would be very offensive, I do not know that the odor itself would create any disease, but you could not keep the wind out in a sick room with that odor—it would kill a man."

He further testifies that the odor did not make him sick, but was very disagreeable, and that he did not think it was unhealthy to a healthy man "no more than a man cleaning out outhouses." Dr. Walter Wyman, who at the time of giving his testimony was surgeon general of the United States marine hospital service, testified in July, 1896:

"I have visited the Government reservation where the Marine Hospital and Quarantine Station at the Delaware Breakwater are situated, and I have experienced there great discomfort from foul odors and unusual quantities of flies. * * * The foul odors were evidently from decaying animal matter, and were so intense as to prevent continuous sleep through the night, causing also a feeling of nausea. * * * The flies evidently came from the neighboring fish-oil factories. They were large, and the cause for their existence in unusual quantities was undoubtedly the factories. * * * The disagreeable odors and unusual quantities of flies referred to must in effect hamper and diminish the efficiency of the administration both of the Marine Hospital and the Quarantine Station at the Delaware Breakwater. * * * The odors complained of, in the event of a large number of immigrants being held under observation, together with cabin passengers taken from an infected steamer, would cause great discontent and increase the difficulty of maintaining discipline and holding said people under the necessary restraints. The odors, in my opinion, would also cause sickness and retard the recovery of the sick in hospital. There is also great danger that the purposes of the Government in maintaining said Marine Hospital and Quarantine Station at this point may be frustrated by the flies, since the latter are carriers of the contagion of cholera."

Dr. Wertenbaker, being recalled, testified in September, 1896:

"Q. 3. I will ask you what has been your experience during the past summer as to any diminution of inconvenience from odors and from flies from the same source? A. We have still had the odors and still had the flies. Q. 4. And would your testimony with respect to the two preceding summers also be applicable to this summer, or not? A. Yes, sir."

He further testifies:

"The flies and the odors in themselves are always a nuisance. They are disagreeable at all times, and especially so when the wind comes from the direction of the fish factories."

Robert Allen, who lived at the quarantine station from August 16 to September 16, 1896, as "general utility man" testifies:

"Q. 4. While on the Government reservation at the Delaware Breakwater, did you ever experience any bad odors, and if so, from whence did they come, if you know? A. On several occasions I experienced an odor that arose

from the fish houses there. Q. 5. Do you know whether it ever made your wife sick? A. Yes, sir; on several occasions. Q. Sick at her stomach? A. Quite sick at the stomach—deprived her of eating her food. * * * XQ. 17. How many times during that month while you were at the quarantine station did you notice these odors? A. I could not tell you the number of times, but two or three times a week. XQ. 18. You are sure of that, are you? A. Quite sure.

He states on re-cross examination that he heard the men at the station "complain at different times about the smell." Isabella Allen, wife of the preceding witness, who was with him at the quarantine station during his stay there testifies:

"Q. 3. You were at service in the doctor's house there, were you not, during your time there? A. Yes, sir. Q. 4. I will ask you whether you were ever annoyed with odors and flies while there, to an unusual degree. A. Yes, sir. Q. 5. Just state what you know about them to the Commissioner? A. Sometimes when I would get up in the morning, I used to be so sick that I could not eat any food, and I had to get up at three or four o'clock in the morning on account of the smell making me sick at the stomach. Q. 6. And it frequently destroyed your appetite to eat your meals? A. Yes, sir; very often. Q. 7. How often would it average a week that these odors would be so disagreeable to you? A. There were some weeks when it was more than others. I didn't really take particular notice, but I know that sometimes it was as many as three or four times in a week. * * * XQ. 26. Then all your knowledge derived from this is what you saw and smelled at the quarantine station? A. Yes, sir. XQ. 27. And not from any knowledge of the fish houses at all? A. The only knowledge I have, the night that we were driving down there I smelled a terrible smell, and I asked the driver what that was, and he said it was the fish houses. I asked him if that was there all the time and he said 'Not all the time.' * * * XQ. 30. You say that these odors and these flies made you sick on an average of three or four times a week? A. Yes, sir. XQ. 31. Then, do I understand you to say that you were sick from this smell one-half the time you were there? A. Yes, sir; I should say so. XQ. 32. One-half the time you were there? A. Yes. XQ. 33. There were other people in the house? A. Yes, sir. * * * XQ. 40. Do you know whether or not any of them were made sick? A. I heard them say it made them sick. One night I had a young lady stop at the breakfast table, and I know they talked once or twice to me in the kitchen about it making them sick. XQ. 41. It seemed to affect you more than anybody else? A. Very much, indeed. I was sick after I got up there for a week. I had to go to the doctor with a bad throat."

The testimony of Andrew H. Baker who, as before stated, lived between the fish factories and the quarantine station, as to the effect of the odor from them upon himself and his family, causing nausea and vomiting, has already been quoted.

The evidence adduced by the defendants palpably fails to meet the case made by the government with respect to the offensive character at the quarantine station of the odor from the fish factories, and the frequency with which it impregnates the air at the station, to say nothing of the flies. A number of the defendants' witnesses are or have been connected with the fish factories or otherwise have become used to their noisome smells, and the statements of others in some instances have been so extreme as to discredit them. Considered as a whole the evidence adduced by the defendants, I think, tends rather to sustain than to refute the contention of the government as to nauseating, discomforting or disagreeable and annoying odors. Reference will be made to the testimony in this connection of some of the

defendants' witnesses. Francis Shunk Brown testified in July, 1897, to the effect that on several occasions within the space of a few years, when on a yacht or ice-boat inside the breakwater, he had noticed an odor from the fish factories when the vessel he was on "was anchored dead to the leeward of them." To the question, "Did you notice any particularly offensive or deleterious odors? " he replied: "I only noticed such odors as you would expect to find at a place where they were converting fish into oil, etc." But that he found the odors disagreeable or discomforting appears from the following testimony:

"Q. 14. How did you avoid this smell when you were anchored in the breakwater? A. Of course, this odor could only be smelt when you are directly to the leeward of the factories, and on one occasion I simply weighed anchor and let the yacht drift along with the tide a short distance until we got out of the line of it, probably three or four hundred yards—something like that."

Levin D. Lynch, who occupied the house on the beach about a mile to the west of the fish factories, testified with respect to the odor, as heretofore stated, "when you first go into it you feel as though you could not stand it hardly." William H. Virden testified to the effect that as contractor and builder he had "been working about the fish factories and the quarantine station nearly every year since both were established"; that during the three or four months while building the doctor's residence at the quarantine station "once or twice my attention was called to the odor. * * * But I do not think at any time that I noticed it over an hour at a time." The witness testified that he had a conversation with Dr. Geddings at the station on the subject of the fish factories.

"Q. 67. Tell us what took place? A. I went up there to put in some water, and it was rather unusual that morning. Q. 68. You mean that the odor was rather unusual that morning? A. Yes, sir; and the doctor made some remarks about it. I used to tantalize him a little. We went down in the cellar and the Doctor spoke about losing his breakfast, and says I, 'It isn't so bad this morning,' and the Doctor said, 'I don't know that it is unhealthy, but it is damnably disagreeable,' or something or another to that effect."

The fact that Virden "used to tantalize him a little" is significant as to the existence of disagreeable odors at the quarantine station. The testimony of this witness, however, is not calculated to impress one as being reliable. John W. Luce, who at the time of giving his evidence had been employed by the defendants at their fish factory continuously since its erection, testified to the effect that he had detected when the wind was blowing in the proper direction the odor from the factories at a distance of "a mile and a half, I guess," and that it came from the fish scrap. Robert Arnold testifies:

"XQ. 28. But I understood you to say there were no odors; that you had never noticed any offensive odors? A. I have been at the hospital— (interrupted by Mr. Vandegrift). XQ. 29. Did you say you never noticed any offensive odors there? A. No more than the smell of a fish factory. XQ. 30. Would it be offensive to you? A. Not to me. XQ. 31. Would it be offensive to other people? A. Some of them claim it is. XQ. 32. Are there not a good many who make that claim? A. My neighbor's hog pen would be offensive to me, as much so as the fish house. XQ. 33. A hog pen is a very offensive thing, isn't it? A. If it is very close to you, it is. Going up

and down I can't help but smell the fish houses, or any other man, if the wind is favorable. XQ. 34. That is, if the wind is blowing from the fish houses towards you, you get them? A. If you are close enough to them; yes, sir. XQ. 35. How far off have you ever noticed them? One witness said that he had noticed them a mile or a mile and a half, or even from here (Lewes) to there (fish factories). How far off have you ever noticed them? A. I have noticed the smell of the fish houses to this town (Lewes). XQ. 36. Pretty strong? A. Yes; I have smelt enough to know what it was."

Elbert T. Williams, a sea captain running a vessel for the fish factories, testifies:

"Q. 40. What about the odors? Have you ever noticed this odor at the iron pier? A. I have, when the wind has been in the right direction. Q. 41. In what direction is that? A. When you are at the iron pier you have to have the wind from the southwest. Q. 42. The wind coming straight from these factories in line with you, you could smell the odor? A. Yes, sir. Q. 43. Was it disagreeable to you? A. Not to me, because I am so used to it; but it might make some others sick. It doesn't have any more effect on me than pouring water on a duck's back."

Edward C Luce, one of the defendants, testifies:

"XQ. 92. There are odors from these fish factories, aren't there? A. Certainly. XQ. 93. And if you are in a breeze that comes from them you catch the odor, do you not? A. Yes, sir; I have noticed this odor quite a distance off, but it is not very objectionable to me. I would think that it was a fish factory. XQ. 94. How far off? A. I do not think I ever noticed it over a mile away. I don't know that I ever did notice it so far as that."

Joseph Draper testifies:

"XQ. 72. How far could you smell the fish house factory with a fair wind? A. I could not say that. I was never far enough away to try it. I have only been on our beach. I don't know that I ever smelt it on our beach two miles above. * * * XQ. 73. Have you ever smelt that as far as we are from the fish factories now? A. Yes; I have smelt it here (Lewes) when the wind was blowing in the right direction. * * * XQ. 78. But there is a pretty stiff odor at times if you are in the breeze, is there not? A. Yes, sir, if you are in the breeze any very close to them there is; but when the wind shifts it goes away."

Charles Keuhn, who was for a number of years a nurse at the quarantine station, testifies:

"XQ. 76. Dr. Geddings testified that he was made sick at the stomach, and that his wife was also made sick, and there were other persons at the station there who testified that they were made sick by the odors from the fish factory. Do you know anything about those instances? A. I only know of one instance when Dr. Wyman was there. XQ. 77. The Surgeon General of the United States? A. Yes, sir. I heard him say when they came out —I was not among them, but I just came out on the steps with them—that he didn't enjoy the breakfast very well on account of the smell. I thought then it was not very bad that day. Gentlemen coming from the city, they are not as used to it as we are."

John W. Josephs, who resided in Lewes twenty eight years previous to giving his testimony and was a pilot, testifies:

"XQ. 30. How far off, with the wind in the right direction, can you smell the fish factories? A. I can't say. Sometimes you can smell it quite a ways, further than you can at other times. I have frequently smelt it at the breakwater. XQ. 31. Some of the witnesses have said they could smell it a mile, and others have said they could smell it a mile and a half. What would you say? A. I would say a mile or a mile and a half. I would not smell it further, I do not think. * * * XQ. 33. It has boarded you at sea, has it? A. No, sir. It has never bothered us any at sea. XQ. 34.

Only when you would come within a mile and a half of shore? A. Inside, close to the breakwater. * * * XQ. 36. Do you like it? A. No, sir; or any other smell. It don't smell very good. XQ. 37. You don't mean to speak that broadly? There are some smells you like, are there not? A. Not anything like that. I smell bone factories and morocco factories, but I don't like them."

Dr. Hiram R. Burton, who has been a practicing physician in Lewes for many years and was also a member of the board of health of that town, testifies:

"Q. 25. When you were around the fish factories you smelt an odor, of course? A. Oh, yes. Q. 26. In your opinion as a practicing physician, is that odor in itself deleterious to health? A. I think not. That is, speaking in general terms now. There might be some people, or there might be some persons who have specially delicate stomachs, that are very sensitive to odors and things of that kind, that might be nauseated by that as they would be by any other unpleasant odor. Sometimes it happens that men cannot stand very much of that thing. I have been nauseated myself."

The witness further states in answering Q. 44 and Q. 45:

"Flies are an annoyance to any sick patient, of course, any patient that you may have, wherever it may be, but I have never known of there being any great disadvantage arise from the presence of flies, except the annoyance."

The witness with respect to the fish factories testifies:

"XQ. 49. You don't believe they are a menace, you mean? A. I do not think so. · I only say that they may be an annoyance, as a disagreeable odor would be to anyone. I think that is all. I think there it stops. XQ. 50. Many of the people have testified that the odors from these fish factories— the people on the reservation—were so nauseous and so disagreeable that they have been nauseated, have been prevented from sleeping, and have been made very sick at the stomach. What would you say with respect to that; is that improbable? A. That is possible. XQ. 51. Such odors as you know emanate from that factory would, in you judgment then, have that effect upon some people? A. Yes, sir. XQ. 52. Then you would not be inclined to dispute the oaths of the people who have testified here to that effect? A. No. There is room for a difference of opinion in that respect. I have no doubt that to a sensitive stomach, a patient that was sick at the hospital might be seriously inconvenienced by the odor, but I do not believe that if they were exposed to it for a day or two, but what they would forget that there was anything of that kind. It is that kind of an odor that you become accustomed to. XQ. 53. Some of the well people who were there, friends and members of the doctor's family, or the men who were working there, have testified that the odor was so bad at times that it made them sick at the stomach. Would you be prepared to say that in your judgment that is not so and impossible? A. No, sir; I am not prepared to say that that is not true. I think very likely that that is true. XQ. 54. You know this odor well, do you? A. Yes, sir; I think I do. I have frequently smelt it off here. XQ. 55. We are now in the town of Lewes and you have smelt it this far? A. Yes, sir. XQ. 56. Is that further than the quarantine station is from these fish factories? A. I think it is rather further."

He further testifies:

"In answer to that question as to whether I was prepared to say that it was not true that those people were not telling the truth when they said it nauseated them, made them sick at the stomach, interfered with their sleep and so on, I have no doubt that is so, and that far any offensive odor, you know, would be prejudicial to the health of an individual if it was continued and continues long—it would be prejudicial to the health of the individual. As I understand, in giving my opinion about the gases conveyed by the winds from these fish factories being prejudical to health, it is as to whether they bear disease germs or not. That, I say, I do not believe; I do

not believe that they are loaded with disease germs; but they may be disagreeable to people, and that they are, I have not the slightest doubt in the world, and would be a great menace to their comfort and pleasure. XQ. 58. If it would have that effect on some people who were in comparatively good health, might not the effect be very serious if you had patients who were brought within the line of this odor and who were in other ways in a weak condition? A. Yes. Anything that nauseated them would be injurious to the patient. * * * XQ. 71. Would you say that because men who work in this factory are well and strong that, therefore, the odors that they are able to dwell in daily with impunity could be inhaled by other persons with equal impunity? A. I think so. XQ. 72. You think so? A. Yes, sir. XQ. 73. And with no different results? A. No different results other than those stated—that it might nauseate some persons unaccustomed to disagreeable odors. To a doctor it would not be any very great annoyance, you know. We are so accustomed to coming in contact with offensive odors that we do not think much of it; it don't interfere with our eating or sleeping, or anything of that sort, as a rule. That is my experience."

He further testifies:

"When the factories are shut down and not at work the odor is very different from what it is when they are in operation. You might get a little odor from the piles of scrap, that comes from there, but it is not mixed with that greasy odor that you get from the kettles of fish boiling. That, I think, is the nauseating odor that they get. RXQ. 85. That is mostly theory on your part? A. Yes, that is theory. I wish to say that I do not want you to understand that the odor from the fish factories is not disagreeable. I am willing to admit that, but I don't believe it is prejudicial to the health of the community."

The United States is represented at the quarantine station in the persons of its officers, agents and servants having charge and occupancy thereof. Immigrants and other persons there detained in quarantine or confined in the marine hospital are so detained or confined by authority of the United States in the maintenance of a system intended and calculated to serve at once as an aid to commerce and a protection against the invasion of the country by contagious and infectious diseases. The United States, owning and holding the property for the accomplishment of these benign purposes, has a right to insist that neither the efficiency of the management of the station nor its usefulness in other respects shall be sacrificed or impaired by nuisances wrongfully created or continued, and it is entitled to secure relief from such nuisances, when materially and injuriously affecting the health or comfort either of those in charge of or employed at the station, or of those detained or confined there. To both classes of persons the government owes protection against such wrongs and the courts should not hesitate to accord it. The evidence in the case is not confined to the subjects of foul or noisome smells passing directly from the fish factories to the quarantine station, and discomfort and annoyance to the inmates of the station from the multiplication of flies resulting from the operation of the factories. It covers several other points on which the counsel for the government laid much stress; among them being the impregnation of the beach with the large amount of liquid refuse daily run from the factories into the bay and consequent contamination of the air with offensive odors, and the increased danger of the spread of contagious and infectious diseases beyond the limits of the quarantine station owing to the great number of flies frequently wafted from the factories to the station.

The evidence on the two points just mentioned is voluminous and is not lightly to be disregarded. There is also evidence touching noises for several hours in the night directly or indirectly caused by the unloading of the fish from the vessels at the factories. But, wholly aside from the three grounds of contention last alluded to, the evidence is full, clear and convincing that the inmates of the quarantine station are materially annoyed and discomforted by offensive, noisome and nauseating odors originating at or in the immediate vicinity of the fish factories and caused by their operation, and that such annoyance and discomfort, while not uninterrupted, occur so frequently as to interfere to an unreasonable and unjustifiable degree with the common enjoyment of life and to constitute a nuisance which should be restrained by injunction, if the government be in a position to complain of it. As before stated in effect, it is not essential to the existence of an actionable nuisance that health should be broken down, impaired or even threatened. Baltimore & Potomac R. R. Co. v. Fifth Bap. Church, 108 U. S. 317, 2 Sup. Ct. 719, 27 L. Ed. 739; Camfield v. United States, 167 U. S. 518, 17 Sup. Ct. 864, 42 L. Ed. 260; Holsman v. Boiling Spring Bleaching Co., 14 N. J. Eq. 335; Ross v. Butler, 19 N. J. Eq. 294, 97 Am. Dec. 654; Cleveland v. Citizens' Gaslight Co., 20 N. J. Eq. 201; State v. Luce, 9 Houst. (Del.) 396, 32 Atl. 1076; Brady v. Weeks, 3 Barb. 157; Campbell v. Seaman, 63 N. Y. 568, 20 Am. Rep. 567; Ducktown Sulphur, Copper & Iron Co. v. Barnes (Tenn.) 60 S. W. 593; Walter v. Selfe, 4 Eng. L. & Eq. 15; Catlin v. Valentine, 9 Paige, 575, 38 Am. Dec. 567; Crump v. Lambert, L. R. 3 Eq. Cas. *409; State v. Wetherall, 5 Har. (Del.) 487; In Baltimore & Potomac R. R. Co. v. Fifth Bap. Church, 108 U. S. 317, 329, 2 Sup. Ct. 719, 726, 27 L. Ed. 739, the court through Mr. Justice Field said:

"That is a nuisance which annoys and disturbs one in the possession of his property, rendering its ordinary use or occupation physically uncomfortable to him. For such annoyance and discomfort the courts of law will afford redress by giving damages against the wrongdoer, and when the cause of the annoyance and discomfort are continuous, courts of equity will interfere and restrain the nuisance."

In Camfield v. United States, 167 U. S. 518, 522–523, 17 Sup. Ct. 864, 866, 42 L. Ed. 260, the court through Mr. Justice Brown said:

"There is no doubt of the general proposition that a man may do what he will with his own, but this right is subordinate to another, which finds expression in the familiar maxim: Sic utere tuo ut alienum non lædas. His right to erect what he pleases upon his own land will not justify him in maintaining a nuisance, or in carrying on a business or trade that is offensive to his neighbors. Ever since Aldred's Case, 9 Coke, 57, it has been the settled law, both of this country and of England, that a man has no right to maintain a structure upon his own land, which, by reason of disgusting smells, loud or unusual noises, thick smoke, noxious vapors, the jarring of machinery, or the unwarrantable collection of flies, renders the occupancy of adjoining property dangerous, intolerable or even uncomfortable to its tenants. No person maintaining such a nuisance can shelter himself behind the sanctity of private property."

Chancellor Zabriskie in Ross v. Butler, 19 N. J. Eq. 294, 97 Am. Dec. 654, in awarding at the suit of sundry owners and occupants of dwelling houses an injunction against the operation of a pottery in which it was proposed to use, in burning the earthenware, pine wood emitting

large volumes of dense and offensive smoke laden with cinders, elaborately reviewed the authorities. Among other things pertinent to this case he said:

"The law takes care that lawful and useful business shall not be put a stop, to on account of every trifling or imaginary annoyance, such as may offend the taste or disturb the nerves of a fastidious or over refined person. But, on the other hand, it does not allow any one, whatever his circumstances or condition may be, to be driven from his home, or to be compelled to live in it in positive discomfort, although caused by a lawful and useful business, carried on in his vicinity. The maxim, sic utere tuo ut alienum non lædas, expresses the well established doctrine of the law. It is not necessary, to constitute a nuisance, that the matter complained of should affect the health or do injury to material property. It is sufficient, in the language of Sir Knight Bruce, if it is 'an inconvenience materially interfering with the ordinary comfort, physically, of human existence, not merely according to elegant and dainty modes and habits of living, but according to plain and sober and simple notions among the English people.' In accordance with this view, it is settled in England and in this country, that smoke, or offensive vapors, or noise, although not injurious to health, may constitute a nuisance; the only question being, whether the degree or extent is such as to interfere materially with the comfort of life. * * * The law, then, must be regarded as settled, that when the prosecution of a business, of itself lawful, in the neighborhood of a dwelling-house, renders the enjoyment of it materially uncomfortable, by the smoke and cinders, or noise or offensive odors produced by such business, although not in any degree injurious to health, the carrying on such business there is a nuisance, and it will be restrained by injunction."

In Cleveland v. Citizens' Gaslight Co., 20 N. J. Eq. 201, the same learned judge, in awarding an injunction against the use of the lime process in the purification of gas, or any process of which lime was a substantial part, and from manufacturing gas in any way that would produce annoyance to persons dwelling in the houses of the complainants, by smoke, gases, other effluvia or odors that might issue from the works, said:

"Unpleasant odors, from the very constitution of our nature, render us uncomfortable, and when continued or repeated, make life uncomfortable. To live comfortably is the chief and most reasonable object of men in acquiring property as the means of attaining it; and any interference with our neighbor in the comfortable enjoyment of life is a wrong which the law will redress. The only question is what amounts to that discomfort from which the law will protect. The discomforts must be physical, not such as depend upon taste or imagination."

It by no means follows from the fact that the odors from the fish factories may not be nauseating or discomforting and annoying to those employed there, or to others inured to noisome smells, that they do not constitute a nuisance to the inmates of the quarantine station and marine hospital. It is important in this connection to bear in mind that the accomplishment of the purposes for which the station and hospital were established involves not only the presence there of the officers and employees in charge, but the detention and confinement of many who have never been subjected to such a tainted atmosphere. In Cleveland v. Citizens' Gaslight Co., supra, the Chancellor said:

"Whatever is offensive physically to the senses, and by such offensiveness makes life uncomfortable, is a nuisance; and it is not the less so, because there may be persons whose habits and occupations have brought them to endure the same annoyances without discomfort. Other persons or classes

of persons whose senses have not been so hardened, and who, by their education and habits of life, retain the sensitiveness of their natural organization, are entitled to enjoy life in comfort as they are constituted. * * * This, then, is the question before me: Whether the proposed works of the defendants would produce such annoyance as would render such families, composed of women and children, as well as men, uncomfortable; not whether men accustomed to follow their occupations in places where they are surrounded, and unavoidably, by much that is offensive, may not be so accustomed to odors of like nature as not to be annoyed by these."

Chief Justice Comegys in charging the jury in State v. Luce, 9 Houst. (Del.) 396, 32 Atl. 1076, said:

"It is true that such of the defendants' witnesses as spoke of the odors resembling fertilizers said that they did not annoy them. Well, there are people in the world who are not made uncomfortable by bad smells. Living among vile odors, having insensitive olfactories, they are shielded, mercifully. But such is not the case with most men, nor with women and female children who have very acute sensibilities. The law of nuisance exists for the protection of such."

It is well settled that the mere fact that one voluntarily "comes to a nuisance" will not preclude him from complaining of and obtaining relief against it. Campbell v. Seaman, 63 N. Y. 568, 20 Am. Rep. 567; Susquehanna Fertilizer Co. v. Malone, 73 Md. 268, 20 Atl. 900, 9 L. R. A. 737, 25 Am. St. Rep. 595; Brady v. Weeks, 3 Barb. 157; Tipping v. St. Helen's Smelting Co., L. R. 1. Ch. App. Cas. *66; Cooley on Torts, 612; People v. White Lead Works, 82 Mich. 471, 46 N. W. 735, 9 L. R. A. 722; Kissell v. Lewis, 156 Ind. 233, 59 N. E. 478; Van Fossen v. Clark, 113 Iowa, 86, 84 N. W. 989, 52 L. R. A. 279. A contrary doctrine would be so unreasonable and oppressive as to work its own condemnation. If, by way of illustration, one should purchase a lot of land one hundred feet square in an uninhabited section and erect and operate upon it a bone boiling establishment, or other factory, causing noxious, noisome or physically discomforting and annoying odors or stenches to spread over the surrounding country within a radius of half a mile from such mill or factory, he would furnish the means of destroying the ordinary enjoyment of human existence throughout an area more than 2188 times as large as the lot owned by him and devoted to the offensive business. It would be in the highest degree unreasonable and absolutely repugnant to the sense of justice that he should in the supposed case have a right to subordinate to his own selfish ends the beneficial enjoyment of land of others having an area in comparison with which that of the lot acquired by him is so insignificant. The establishment of the offensive business in such case could not prevent the then owners of the residue of the land within the sphere of the noisome odors from building and occupying dwelling houses thereon, nor deprive them of the right to have and enjoy reasonably pure and inoffensive air in and about their homes. Such right they would possess by virtue of their ownership and occupancy of the land; and that right undoubtedly would pass to their grantees or others taking title mediately or immediately from them. Indeed, were such right not capable of passing to others, the value of the land in the hands of those subsequently parting with the title would be seriously impaired or, perchance, wholly destroyed, by the erection and opera-

tion of the offensive business, and those succeeding to the title would be without remedy or redress of any kind for the continuance of the nuisance. But such clearly is not the law. Cooley, in his work on Torts, p. 612, says:

"The party who at the time suffers the inconvenience of a nuisance is entitled to complain of it, and it is immaterial whether it was or was not a nuisance to him in its origin. Therefore, it is of no importance to the right of action that the plaintiff has come into the neighborhood since the nuisance was created; he has the right to locate himself wherever he can do so to his satisfaction, and no one can have the authority to set limits to his choice of location by interposing something which is offensive. Moreover, it would detract very seriously from the value of property if the owner, desiring to dispose of it, could not transfer all his rights, including his right to protection in its complete enjoyment, but must, when a nuisance is created near him, either await the result of proceedings for its abatement, or dispose of his land with the nuisance practically assented to, and for a price which the nuisance has assisted in establishing. Nothing can be plainer than if the grantor could have complained when he conveyed, the grantee may complain afterwards; and to whatever use the grantor might have put the land, as being suitable and proper for the locality, the grantee is at liberty to choose and adopt."

In Campbell v. Seaman, 63 N. Y. 568, 20 Am. Rep. 567, the court through Earl, J., said:

"It matters not that the brickyard was used before plaintiffs bought their lands or built their houses. * * * One cannot erect a nuisance upon his land adjoining vacant lands owned by another and thus measurably control the uses to which his neighbor's land may in the future be subjected. He may make a reasonable and lawful use of his land and thus cause his neighbor some inconvenience, and probably some damage which the law would regard as damnum absque injuria. But he cannot place upon his land anything which the law would pronounce a nuisance, and thus compel his neighbor to leave his land vacant, or to use it in such way only as the neighboring nuisance will allow."

Where one operates a factory emitting foul or noisome smells, and owns and controls all the land within the area traversed by them in sufficient strength to be nauseating or substantially discomforting and annoying, no one has just cause of complaint. But to foist impure and disgusting odors upon others in their homes is a different matter, and save in localities generally devoted to business of a character to produce such or equally offensive smells, or unless by virtue of grant, license, estoppel or prescription, is not to be tolerated.

The factory of the defendants and that erected by S. S. Brown & Company, as has been stated, are so situated with respect to each other that when the wind is in such direction as to carry the odors from one of them to the quarantine station it will carry the odors from the other there, and the odors from one cannot be distinguished from the odors from the other. There is no evidence of co-operation, privity or business relationship of any kind between the defendants and S. S. Brown & Company in the erection and operation of their respective factories, or between the defendants and the succeeding owners or managers, if such there be, of the factory erected by S. S. Brown & Company; nor is there any evidence to the point that the odors from either of the factories alone would or would not so contaminate the air at the quarantine station as to create a nuisance there within the definition of the authorities. But the combined odors from both factories un-

questionably have that effect, and in producing it the two establishments in fact co-operate in and contribute to the creation of the nuisance. Under these circumstances, in the absence of a plain, adequate and complete remedy at law, the owners or managers of both or either of the factories can be enjoined from maintaining or contributing to the maintenance of the nuisance. Woodyear v. Schaefer, 57 Md. 1, 40 Am. Rep. 419; Chipman v. Palmer, 77 N. Y. 51, 33 Am. Rep. 566; Lockwood Co. v. Lawrence, 77 Me. 297, 52 Am. Rep. 763; Hillman v. Newington, 57 Cal. 56; Thorpe v. Brumfitt, L. R. 8 Ch. App. Cas. 650; People v. Gold Run D. & M. Co., 66 Cal. 138, 4 Pac. 1152, 56 Am. Rep. 80. In Thorpe v. Brumfitt, supra, it was held that the acts of several persons may together constitute a nuisance, which the court will restrain, though the damage occasioned by the acts of any one, if taken alone, would be inappreciable. Sir W. M. James, L. J., in affirming the decree of the Master of the Rolls, awarding a perpetual injunction, said:

"Then it was said that the plaintiff alleges an obstruction caused by several persons acting independently of each other, and does not show what share each had in causing it. It is probably impossible for a person in the plaintiff's position to shew this. Nor do I think it is necessary that he should shew it. The amount of obstruction caused by any one of them might not, if it stood alone, be sufficient to give any ground of complaint, though the amount caused by them all may be a serious injury. Suppose one person leaves a wheelbarrow standing on a way, that may cause no appreciable inconvenience, but if a hundred do so that may cause a serious inconvenience, which a person entitled to the use of the way has a right to prevent; and it is no defense to any one person among the hundred to say that what he does causes of itself no damage to the complainant."

In Woodyear v. Schaefer, supra, in which the court of appeals reversed the decree of the court below refusing an injunction to restrain an alleged nuisance, the court through Magruder, J., said:

"It is no answer to a complaint of nuisance that a great many others are committing similar acts of nuisance upon the stream. Each and every one is liable to a separate action, and to be restrained. * * * The extent to which the appellee has contributed to the nuisance, may be slight and scarcely appreciable. Standing alone, it might well be that it would only, very slightly, if at all, prove a source of annoyance. And so it might be, as to each of the other numerous persons contributing to the nuisance. Each, standing alone, might amount to little or nothing. But it is when all are united together and contribute to a common result, that they become important as factors, in producing the mischief complained of. * * * One drop of poison in a person's cup, may have no injurious effect. But when a dozen, or twenty, or fifty, each put in a drop, fatal results may follow. It would not do to say that neither was to be held responsible. In that state of facts, as in the one presented by this case, each element of contributive injury is a part of one common whole, and to stop the mischief of the whole, each part in detail must be arrested and removed. The right to pure air is held to be a natural right, and as incident to the enjoyment of land. Its sensible pollution by the exercise of a noxious trade, whereby the comfortable enjoyment of property is diminished, is a nuisance, against which courts of equity will always, when the state of facts applies, give relief, and such injury as is not fairly and reasonably incident to the ordinary use of property, and renders surrounding property physically uncomfortable, will be restrained. * * * And the remedy in equity to prevent a nuisance, is generally said to exist whenever the nature of the injury is such that it cannot be adequately compensated by damages, or will occasion a constantly recurring grievance. An injunction is the only effectual remedy to stop the injury. Adams, Eq. 211.

Especially is this the case when the injury is caused by so many, that it would be difficult to apportion the damage, or say how far any one may have contributed to the result, and so damages would likely be but nominal, and repeated actions without any substantial benefit, might be the result. This very difficulty in obtaining substantial damages was stated in Clowes v. Staffordshire, & Co., 1 L. R. Ch. App. 142, to be a ground for relief by injunction. And the doctrine is well settled that where the nuisance operates to destroy health, or impair the comfortable enjoyment of property, an action at law furnishes no adequate remedy, and protection by injunction must be given. * * * We think that the complainant has shown himself to have suffered greatly, and likely to suffer more in the future, from the nuisance to his property, whereby it is likely to become practically valueless, unless the injury is restrained. He will be entitled to the same relief against all the parties contributing to the injury, and as all are together contributing to the same result, if the injury does not cease upon the granting of the injunction in this case, he may be entitled to join in one case, all who still continue the injury; upon the principle of the case of Thorpe v. Brumfitt, 8 L. R. Ch. 656, where it is held that the acts of several persons, acting separately, and without concert and entirely independent of each other, may together constitute a nuisance, when the acts of either one alone would not create it, and such persons may be joined as defendants in a bill for an injunction."

In Lockwood Co. v. Lawrence, supra, where a bill was filed to restrain a nuisance, the same doctrine was clearly enunciated. The court through Foster, J., said:

"In considering the questions thus raised by the pleadings upon this branch of the case, and assuming the facts set forth by the allegations in the bill to be true, no other conclusion can be reached than that the respondents, though acting independently of each other as alleged, all deposit the refuse material and debris arising from the operation of their mills into the same stream, whence, by the natural current of the water, it is carried down the river and commingles before reaching the complainants' ponds, raceways, racks and wheels, where the nuisance complained of is committed. * * * Whatever, then, may have been the act of these different respondents, either in the operation of their several mills, or in the depositing of the waste and debris arising from such operations, into the stream, there is a co-operation in fact in the production of the nuisance. * * * The acts of the respondents may be independent and several, but the result of these several acts combines to produce whatever damage or injury these complainants suffer, and in equity constitutes but one cause of action. It is otherwise in law where damages are sought to be recovered. There, only those parties can be joined who have acted jointly in the commission of the act. There must be concert of action and co-operation to make several persons jointly liable in an action at law. * * * In the case at bar, it may be that the act of any one respondent alone might not be sufficient cause for any well grounded action on the part of the complainants; but when the individual acts of the several respondents, through the combined results of these individual acts, produce appreciable and serious injury, it is a single result, not traceable perhaps to any particular one of these respondents, but a result for which they may be liable in equity as contributing to the common nuisance, as we have before stated."

The case of People v. Gold Run D. & M. Co., supra, is in line with the other decisions cited in this connection. The court through McKee, J., said:

"But it is contended that as the nuisance complained of and found by the court was the result of the aggregate of mining debris dumped into the stream by the defendant and other mining companies, acting separately and independently of each other, the acts of the defendant cannot be joined with the acts of other mining companies, to create a cause of action against the defendant. * * * This case (Hillman v. Newington, supra) clearly recognized the equitable principle that, in an action to abate a public or private

nuisance, all persons engaged in the commission of the wrongful acts which constitute the nuisance may be enjoined, jointly or severally. It is the nuisance itself, which, if destructive of public or private rights of property, may be enjoined."

The frequency with which during the period from July 1 to the early part or middle of November in each year the quarantine station is visited with the noisome smells is sufficient to constitute a nuisance there. In Ross v. Butler, 19 N. J. Eq. 294, 302, 97 Am. Dec. 654, the court said:

"In this case, it is contended that as the burning will be but twice in a month, and for twelve hours only, and that principally at night, it will be so slight as not to be a material discomfort. A nuisance of this kind may possibly occur so seldom that it will not be held to produce a material discomfort. Where the occurrence was only accidental and not produced by the regular course of business, and recurring only three or four times a year, and not intended to be again permitted, it was held not to be a proper cause for an injunction to stop a lawful business, but that the party must be put to his action for damages. But I am not aware of any authority or established principle, holding that a clear unmistakable nuisance, which it is intended to commit periodically, will be permitted because it does not exist the greater portion of the time, but only for a small portion of it. This court will not determine that a family shall have their dwelling-house made uncomfortable to live in for twelve hours, once in two weeks, or that they shall protect themselves by closing the house tightly, and remaining in doors for that time. It is surely no justification to a wrongdoer, that he takes away only one-twenty-eighth of his neighbor's property, comfort, or life. The qualifications contained in the opinions of the judges that a lawful business will not be restrained for every trifling inconvenience, and that persons must not stand on extreme rights, and bring actions in respect to every matter of annoyance, does not refer to the proportion of time for which the nuisance is continued, but only to the degree or kind of annoyance."

In Campbell v. Seaman, supra, the court said:

"The policy of the law favors, and the peace and good order of society are best promoted by the termination of such litigations by a single suit. The fact that this nuisance is not continual, and that the injury is only occasional, furnishes no answer to the claim for an injunction. The nuisance has occurred often enough within two years to do the plaintiffs large damage. Every time a kiln is burned some injury may be expected, unless the wind should blow the poisonous gas away from plaintiff's lands. Nuisances causing damage less frequently have been restrained."

The doctrine that owners and occupants of houses and lands are entitled to the enjoyment of air of reasonable purity, though of general, not being of universal application, often there is difficulty in applying it to a given case. Considerations affecting the social state require in some instances concessions or compromises, to a greater or less extent, of what would otherwise be regarded as of strict right. Cogswell v. N. Y., etc., R. Co., 103 N. Y. 10, 8 N. E. 537, 57 Am. Rep. 701; Campbell v. Seaman, 63 N. Y. 568, 20 Am. Rep. 567; People v. White Lead Works, 82 Mich. 471, 46 N. W. 735, 9 L. R. A. 722; Robinson v. Baugh, 31 Mich. 289, 295, 296. In Cogswell v. N. Y., etc., R. Co., supra, the court through Andrews, J., said:

"The compromises exacted by the necessities of the social state, and the fact that some inconvenience to others must of necessity often attend the ordinary use of property, without permitting which there could in many cases be no valuable use at all, have compelled the recognition, in all systems of

jurisprudence, of the principle that each member of society must submit to annoyances consequent upon the ordinary and common use of property, provided such use is reasonable both as respects the owner of the property, and those immediately affected by the use, in view of time, place and other circumstances. It is in many cases difficult to draw the line, and to determine whether a particular use is consistent with the duties and burdens arising from vicinage, or whether it inflicts an injury for which the law affords a remedy."

In Campbell v. Seaman, supra, the court said:

" 'Sic utere tuo ut alienum non lædas' is an old maxim which has a broad application. It does not mean that one must never use his own so as to do any injury to his neighbor or his property. Such a rule could not be enforced in civilized society. Persons living in organized communities must suffer some damage, annoyance and inconvenience from each other. For these they are compensated by all the advantages of civilized society. If one lives in the city he must expect to suffer the dirt, smoke, noisome odors, noise and confusion incident to city life."

But the existence of the two factories in question does not constitute such an industrial or manufacturing neighborhood that the government is compelled to submit to the stench emanating from them. It cannot be compared to the growth and territorial expansion of the industries of a city. In Cleveland v. Citizens' Gaslight Co., 20 N. J. Eq. 201, 208, the court said:

"The justification that this is a neighborhood devoted to such manufacture, in which annoyances of this kind should not be restrained, is not sustained by the proof. Only two factories that could be an annoyance are shown. One the patent leather manufactory, and the other the cement works. No neighborhood can be outlawed from protection by the existence of only two establishments of this kind. It is only when a town or part of a town is, by their continuance for years, wholly given up to such establishments, so that one more would not add sensibly to the discomfort, that this rule applies; as if in Sheffield, Birmingham, or Pittsburg, or any other city, begrimed and clouded with the soot and smoke issuing from hundreds of engines, one more was added, such almost imperceptible addition to the evil would not be restrained."

The principal question after all is whether the defendants, in view of their obligations to others, are making a reasonable use of the premises occupied by them. Are they duly observing the precept, sic utere tuo ut alienum non lædas? On the evidence and the authorities clearly they are not. In Ducktown Sulphur, Copper & Iron Co. v. Barnes (Tenn.) 60 S. W. 593, the Court of Chancery Appeals through Wilson, J., said:

"The place where a business is carried on may be convenient to the party engaged in it, and it may be convenient to the public, but in legal contemplation no place can be suitable or convenient for carrying on a business which is a nuisance and inflicts material injury to the property of another. No use of one's land can be held to be a reasonable use which deprives an adjoining owner of the lawful use and enjoyment of his property. * * * It is enough that the enjoyment of life and property has been rendered uncomfortable."

In Attorney General v. Cole, L. R. 1 Ch. 1901, 205, the court through Kekewich, J., said:

"Is what is complained of a nuisance? And if it really is a nuisance, then it seems almost to follow as a matter of course that it is a nuisance which ought to be restrained, assuming that it is not of a trifling or a passing character. * * * Can a man reasonably create a nuisance? That seems to me

to be the question. I think the answer to be derived from the case of Bamford v. Turnley, from which, so far as I am aware, there has never been any departure at all, is that he cannot. If he commits a nuisance, then he cannot say that he is acting reasonably. The two things are self-contradictory."

In Campbell v. Seaman, 63 N. Y. 568, 20 Am. Rep. 567, the court said:

"Every person is bound to make a reasonable use of his property so as to occasion no unnecessary damage or annoyance to his neighbor. If he makes an unreasonable, unwarrantable or unlawful use of it, so as to produce material annoyance, inconvenience, discomfort or hurt to his neighbor, he will be guilty of a nuisance to his neighbor. And the law will hold him responsible for the consequent damage. As to what is a reasonable use of one's own property cannot be defined by any certain general rules, but must depend upon the circumstances of each case. A use of property in one locality and under some circumstances may be lawful and reasonable, which, under other circumstances, would be unlawful, unreasonable and a nuisance."

The doctrine of the balance of convenience or injury which so frequently is determinative of the propriety of granting or denying a preliminary injunction has no application to decrees after a hearing on plenary proofs taken in due course. Endlich, J., in delivering the opinion of the court below, which was approved on appeal in Evans v. Fertilizer Co., 160 Pa. 209, 222, 28 Atl. 702, 709, said:

"So far as the 'balance of injury' notion refers to the parties of the litigation, it is pointed out in Higgins v. Water Co., 36 N. J. Eq. 538, 544, that its legitimate application is to motions for preliminary injunctions, not to final decrees. Where the question for the' consideration of the court is as to the propriety of stopping a business by preliminary injunctions upon an ex parte showing, which may or may not be substantiated by further examination of the case in due course, it is very well for a chancellor to take into account the magnitude of the defendant's investment and compare it with the character of the plaintiff's alleged injury, and if the latter appears trifling beside that which would result from the impairment of the former, he may well refuse to exercise his power until more fully advised. But where, upon final hearing the mind of the chancellor is satisfied that the complainant's right is clear, and the injury sustained by him substantial, so that his claim to damages at law is indisputable, and where, moreover, such damages could not give him adequate redress except by an endless repetition of suits, a refusal of an injunction, upon the ground that plaintiff cannot suffer as great a loss from the continuance of the nuisance as defendant would from its interdiction, would be as far removed from equity as can be."

The fact that defendants have invested a considerable amount of money cannot clothe them with immunity for creating or contributing to and maintaining a nuisance. In Pennsylvania Lead Co.'s Appeal, 96 Pa. 116, 42 Am. Rep. 534, the court, through Gordon, J., said:

"Where, in ordinary parlance, the damage sought to be prevented is irreparable, that is, where the wrong is repeated from time to time, or is of a continuing character, or productive of damages which cannot be measured by ordinary standards, equity may be invoked. * * * The rule sic utere tuo ut alienum non lædas is a most valuable one, and must be maintained if our civilization is to be cherished and preserved, and it is not at all to the purpose to answer the charge of a violation of this rule that the defendant's works have been erected at a great outlay of capital; that they are important to the public at large, and give employment to many men. * * * Where justice is properly administered rights are never measured by their mere money value, neither are wrongs tolerated because it may be to the advantage of the powerful to impose upon the weak. Whether it be the great corpora-

tion with its lead works, or the mechanic with his tin shop, the rule is the same: 'So use your own as not to injure another.'"

Endlich, J., in delivering the opinion of the court below, approved, as before stated, on appeal in Evans v. Fertilizer Co., 160 Pa. 209, 224, 28 Atl. 702, 709, said:

"There is to my mind no more offensive plea than that by which one seeks to justify an act injurious to his neighbors on the ground of its advantage to himself. * * * Where justice is properly administered, rights are never measured by their mere money value, neither are wrongs tolerated because it may be to the advantage of the powerful to impose upon the weak."

In Susquehanna Fertilizer Co. v. Malone, 73 Md. 268, 20 Atl. 900, 9 L. R. A. 737, 25 Am. St. Rep. 595, which related to a nuisance resulting from the operation of a fertilizer factory, the court through Robinson, J., said:

"No principle is better settled than that where a trade or business is carried on in such a manner as to interfere with the reasonable and comfortable enjoyment by another of his property, or which occasions material injury to the property itself, a wrong is done to the neighboring owner, for which an action will lie. And this, too, without regard to the locality where such business is carried on; and this, too, although the business may be a lawful business, and one useful to the public, and although the best and most approved appliances and methods may be used in the conduct and management of the business. * * * The law, in cases of this kind, will not undertake to balance the conveniences, or estimate the difference between the injury sustained by the plaintiff, and the loss that may result to the defendant from having its trade and business, as now carried on, found to be a nuisance. No one has a right to erect works which are a nuisance to a neighboring owner, and then say he has expended large sums of money in the erection of his works, while the neighboring property is comparatively of little value. The neighboring owner is entitled to the reasonable and comfortable enjoyment of his property, and if his rights in this respect are invaded, he is entitled to the protection of the law, let the consequences be what they may."

The circumstances under which the defendants erected and have continued to operate their factory are not such as to disclose a reasonable use by them of their premises or to clothe them with an equity as against the government. Of all localities at or near the mouth of the Delaware bay the quarantine station was erected in that most convenient and desirable for the purposes of such an establishment. The government had constructed the breakwater affording a safe and excellent harbor as well for the facilitation of the transfer of persons from vessels to the quarantine station and marine hospital as for shipping generally. It had also built a pier to the east and a life saving station to the west of the site of the fish factories and within such a short distance from that site that the erection and operation of the latter could not fail so to contaminate the air with noisome odors as frequently, if not continuously, to cause discomfort and annoyance at those government works. From the initiation of their fish fertilizer business the defendants, while availing themselves of the protection of the breakwater, have displayed a striking lack of consideration toward the government by the emission of foul and nauseating smells injuriously affecting its interests. In view of the peculiar suitability of the site of the quarantine station for the accomplishment of the beneficent and important public purposes for which the station was designed and

of the establishment by the government of environments materially contributing thereto, it is clear that, on the question whether the right of the government to have uncontaminated and reasonably pure air at the quarantine station and marine hospital is not superior to any supposed right or equity on the part of the defendants in the conduct of their business to create or contribute to noisome odors substantially and injuriously affecting the inmates of the station and hospital, the case is altogether with the government.

This court has jurisdiction to award an injunction in this case. Campbell v. Seaman, 63 N. Y. 568, 20 Am. Rep. 567; Baltimore & Potomac R. R. Co. v. Fifth Bap. Church, 108 U. S. 317, 329, 2 Sup. Ct. 719, 27 L. Ed. 739; Holsman v. Boiling Spring Bleaching Co., 14 N. J. Eq. 335; Ross v. Butler, 19 N. J. Eq. 294, 97 Am. Dec. 654; New Castle v. Raney, 130 Pa. 546, 564, 18 Atl. 1066, 6 L. R. A. 737; Sellers v. Parvis & Williams Co. (C. C.) 30 Fed. 164; Crump v. Lambert, L. R. 3 Eq. Cas. *409; Woodyear v. Schaefer, 57 Md. 1, 40 Am. Rep. 419; Hillman v. Newington, 57 Cal. 66; Clowes v. Staffordshire, etc., Co., L. R. 8 Ch. App. Cas. 125, 142; Thorpe v. Brumfitt, L. R. 8 Ch. 650; People v. Gold Run D. & M. Co., 66 Cal. 138, 4 Pac. 1152, 56 Am. Rep. 80; Adams v. Michael, 38 Md. 123, 17 Am. Rep. 516. Such jurisdiction exists by reason of the absence of a plain, adequate and complete remedy at law. The existence of such a remedy is negatived by several separate and independent considerations. Injury resulting from noisome or foul odors producing personal discomfort and annoyance is not susceptible of compensation in damages according to any approximately accurate measure, and from its recurrence would lead to multiplicity of suits. In Holsman v. Boiling Spring Bleaching Co., supra, the court said:

"The court of chancery has a concurrent jurisdiction with courts of law, by injunction, equally clear and well established, in cases of private nuisance. * * * To entitle the party to the remedy by injunction in cases of private nuisance, the right must be clear, and the injury must be such as from its nature is not susceptible of being adequately compensated for by damages, or such as from its long continuance may occasion a constantly recurring grievance which cannot be prevented otherwise than by injunction. Where the nuisance operates to destroy health or to diminish the comfort of a dwelling an action at law furnishes no adequate remedy, and the party injured is entitled to protection by injunction."

In Sellers v. Parvis & Williams Co., supra, this court, through Wales, J., said:

"When a plain and adequate remedy at law cannot be obtained, the power of a court of equity to abate a private nuisance which is destructive of the property of a complainant, or renders its use and occupation physically uncomfortable, is no longer questionable. The jurisdiction of the court, in such cases, is predicated upon the broad ground of preventing irreparable injury, interminable litigation, a multiplicity of actions, and for the protection of rights. * * * The right to pure air is incident to the land,—as much so as the right to the uninterrupted flow of a stream of pure water which runs through it,—and no one can be permitted to pollute either, to the injury and disadvantage of the owner."

In Campbell v. Seaman, supra, the court said:

"A suit at law is no longer a necessary preliminary, and the right to an injunction, in a proper case, in England and most of the states, is just as fixed

and certain as the right to any other provisional remedy. The writ can rightfully be demanded to prevent irreparable injury, interminable litigation and a multiplicity of suits, and its refusal in a proper case would be error to be corrected by an appellate tribunal. It is a matter of grace in no sense except that it rests on the sound discretion of the court, and that discretion is not an arbitrary one. If improperly exercised in any case either in granting or refusing it, the error is one to be corrected upon appeal."

In Adams v. Michael, supra, the court with respect to the injunctive power to restrain the erection or continuance of a nuisance, said:

"The power to interfere by injunction to restrain a party from so using his own property as to destroy or materially prejudice the rights of his neighbor, and thus to enforce the maxim, 'sic utere tuo ut alienum non lædas,' is not only a well established jurisdiction of the court of chancery, but is one of great utility, and which is constantly exercised. Indeed, without such jurisdiction, parties would in many cases suffer the greatest wrongs, for which actions at law would afford them no adequate redress."

The peculiar curcumstances of this case afford further support to the proposition that the United States, unless prevented by estoppel, acquiescence, or some other act or conduct on its part, is here entitled to injunctive relief. That the government, in the absence of a plain, adequate and complete remedy at law has a right to maintain an injunction bill to restrain a nuisance materially and injuriously affecting the occupancy of its own property there can be no doubt. Camfield v. United States, 167 U. S. 518, 17 Sup. Ct. 864, 42 L. Ed. 260. If, as is the case, a private individual be entitled to equitable relief against foul or noisome odors rendering the occupancy of his property substantially and frequently discomforting and annoying, the government for stronger reasons is entitled to such relief against the continuous or recurrent nuisance at the quarantine station. For should the government resort to an action at law, it could not recover damages measured by the discomfort and annoyance suffered by the inmates of the station; and, unless the nuisance were of such intensity as to compel an abandonment of the station by the government, there would be absolutely no basis on which it would be possible even to guess at the quantum of damages. Further, in view of the fact that the nuisance has been created by both of the fish factories without concert between those operating them and with no practicable means of ascertaining what the effect of that of the defendants alone would be, it is very questionable whether the government could in an action at law recover even nominal damages. In Chipman v. Palmer, 77 N. Y. 51, 33 Am. Rep. 566, not to mention cases hereinbefore cited, the court, through Miller, J., said:

"The right of the plaintiff to recover of the defendant all the damages which he had sustained by reason of the nuisance I think cannot be maintained. The injury was not caused by the act of the defendant alone, or by that of others who were acting jointly or in concert with the defendant. It was occasioned by the discharge of sewerage from the premises of the defendant and other owners of lots into the creek separately and independently of each other. The right of action arises from the discharge into the stream, and the nuisance is only a consequence of the act. The liability commences with the act of the defendant upon his own premises, and this act was separate and independent of and without any regard to the act of others. The defendant's act, being several when it was committed, cannot be made joint because of the consequences which followed in connection with others who

had done the same or a similar act. It is true, that it is difficult to separate the injury; but that furnishes no reason why one tort feasor should be liable for the act of others who have no association and do not act in concert with him. If the law was otherwise, the one who did the least might be made liable for the damages of others, far exceeding the amount for which he really was chargeable, without any means to enforce contribution, or to adjust the amount among the different parties. * * * While an action in equity may be maintained in favor of different parties, who were the owners of property upon the same stream, against the owners of different properties, to restrain the nuisance, they may not be jointly or severally liable for the entire injury occasioned thereby. * * * While, as we have seen, an equitable action will lie to restrain parties who, severally contribute to a nuisance, the general rule is well settled that where different parties are engaged in polluting or obstructing a stream, at different times and places, the whole damages occasioned by such wrongful acts cannot be collected of one of the parties. * * * There must be concert of action and co-operation to make several persons jointly liable."

The jurisdiction of this court to award an injunction in this case, therefore, seems clear; and, possessing such jurisdiction, it has plenary power over the suit, including the ascertainment of disputed facts. Such an ascertainment, indeed, is contemplated by the Constitution. In Parsons v. Bedford, 3 Pet. 432, 446, 7 L. Ed. 732, the court, through Mr. Justice Story, said:

"It is well known, that in civil causes in courts of equity and admiralty, juries do not intervene, and that courts of equity use the trial by jury only in extraordinary cases, to inform the conscience of the court. When, therefore, we find that the amendment requires that the right of trial by jury shall be preserved, in suits at common law, the natural conclusion is, that this distinction was present to the minds of the framers of the amendment."

The defendants, even on the assumption that the government is proceeding in this suit in a quasi private or proprietary character, have not acquired a prescriptive right as against it to continue or contribute to the continuance of the nuisance complained of, nor has there been any such acquiescence, act or conduct on the part of the government as to estop or preclude it from complaining of such nuisance. Mere lapse of time short of the prescriptive period cannot operate as a bar. In Campbell v. Seaman, 63 N. Y. 568, 20 Am. Rep. 567, the court said:

"It is claimed that the plaintiffs so far acquiesced in this nuisance as to bar them from any equitable relief. I do not perceive how any acquiescence short of twenty years can bar one from complaining of a nuisance unless his conduct has been such as to estop him."

In Crump v. Lambert, L. R. 3 Eq. Cas. *409, Lord Romilly, M. R., said:

"It is true that, by lapse of time, if the owner of the adjoining tenement, which, in case of light or water, is usually called the servient tenement, has not resisted for a period of twenty years, then the owner of the dominant tenement has acquired the right of discharging gases or fluid, or sending smoke or noise from his tenement over the tenement of his neighbor; but until that time has elapsed, the owner of the adjoining or neighboring tenement, whether he has or has not previously occupied it,—in other words, whether he comes to the nuisance or the nuisance comes to him,—retains his right to have the air that passes over his land pure and unpolluted, and the soil and produce of it uninjured by the passage of gases, by the deposit of deleterious substances, or by the flow of water."

The law, indeed, goes further and holds that, notwithstanding the prescriptive period may have fully elapsed, no right to maintain a private nuisance is thereby acquired except as against those who have during all of that period been in such position as to entitle them to complain of it. Sturges v. Bridgman, L. R. 11 Ch. Div. 852. One is not short of the prescriptive period deprived of a remedy for a private nuisance he suffers from unless there has been such conduct on his part as to render it fraudulent or inequitable that he should seek its suppression. In Leonard v. Spencer, 108 N. Y. 338, 346, 15 N. E. 397, the court through Earl, J., said:

"There was no such acquiescence, within the meaning of the law, as deprives the plaintiff of the remedy which he now seeks for the abatement of the nuisance. It does not appear that he actively encouraged the defendants in the erection of their buildings and structures. They were erected upon their own land, and it was not within his power to interfere with or prevent their erection. All that can be said is that he did not make objection or protest against their erection, and that he did not give notice that the operation of the dam for the uses of the factory would prove detrimental or injurious to him. But what is still more important, it does not appear that the defendants took any action whatever in reliance upon the silence or acquiescence of the plaintiff."

In Radenhorst v. Coate, 6 Grant's Ch. 139, Spragge, V. C., used language, quoted in the case last referred to, as follows:

"The omission to warn the defendant, and the subsequent forbearance to take any proceedings against him, are relied upon as disentitling the plaintiff to relief. We do not think that it is shown by the evidence that there was any encouragement on the part of Mr. Radenhorst, or that the defendant took any step or incurred any expense upon the faith of anything said or done by Mr. Radenhorst, or that Mr. Radenhorst's conduct had any influence in determining the defendant to do anything in regard to his factory. Putting it most strongly for the defendant, that the evidence will warrant, there was an acquiescence for several years in the defendant's carrying on his business as he did carry it on, but nothing more. It is a plain common law right to have the free use of the air in its natural unpolluted state, and an acquiescence in its being polluted for any period short of twenty years will not bar that right. To bar that right within a shorter period, there must be such encouragement or other act by the party afterwards complaining as to make it a fraud in him to object."

It does not appear either directly or inferentially that the government at any time assented to or acquiesced in the operation of the fish factories in such manner as to produce or contribute to the production of the nuisance of which it now complains. These factories were not, nor was either of them, located, built or operated by the procurement or inducement of the government, nor under any promise, express or implied, on its part that no complaint would be made by it of foul, noisome or nauseating odors, emanating from the manufacture of fish fertilizer, and passing to and over the site of the quarantine station. The evidence wholly fails to disclose the essential elements of an estoppel in pais or an equitable estoppel against the government. The period necessary for the acquisition of a prescriptive right on the part of the defendants as against the government had not elapsed before the filing of the bill in this case, and such right was not and could not be acquired afterwards. It does not appear that the government was prior to the cession to it by Delaware of the site of the quarantine station

in 1889 in a position, or had any right, to complain of the stench resulting from the operation of the fish factories or either of them; for, as before stated, there is no evidence that prior to such cession the United States had any right, title, interest or claim to or in the site of the present quarantine station and marine hospital. The acquisition of a prescriptive right by the defendants is, therefore, wholly negatived. If the unwarrantable assumption be made that the mere lapse of time short of the prescriptive period may be evidence of such laches as would bar the government, there was not even on that assumption such laches as to defeat this suit. The cession having been made to the United States in 1889, the buildings on the quarantine station were thereafter completed within less than one year of the commencement of this suit. Under these circumstances any imputation of laches on the part of the government is wholly inadmissible.

This court is strongly impressed with the conviction that unless efficient relief be granted in the present proceedings to the government from atmospheric contamination caused by the fish factories, the nuisance complained of will by gradual addition grow to such an extent as to destroy the usefulness, or compel the abandonment by the United States, of the quarantine station and marine hospital, to the serious detriment of the public interests. To assume that the government should be forced to acquire by purchase or condemnation all the territory within the sphere of operation of the nuisance created by the fish factories is unwarranted by the authorities and a palpable absurdity. The government is entitled to injunctive relief.

What should be the nature and scope of the injunction which should now be awarded has been the subject of careful consideration. It would not be a proper exercise of authority, unless necessary to effect a discontinuance of the nuisance, to put a stop to the operation of the factory of the defendants, thereby destroying their business and the value of their present plant. It may and probably will be necessary to do this; but I am not now prepared to hold that it is impossible that such expedients may be adopted in the conduct of their business as to remove all just cause of complaint by the government. The accomplishment of this end would save from interruption or destruction a lawful and useful business; and the defendants should be accorded a fair opportunity of suppressing the nuisance caused or contributed to by them, if they can. It is a matter of common knowledge that by the use of deodorizers and disinfectants, by the combustion of fumes, and by preventing exposure of offensive matter to the outside air, and possibly by other means, foul, physically discomforting and nauseating odors largely may be controlled and neutralized. A decree will be made awarding an injunction against the operation of the factory of the defendants as a fish factory without such use of deodorizers and disinfectants in and about the factory, such combustion of the fumes generated or present in the factory, such prevention of exposure of fish scrap or other offensive refuse from the factory to the outside air or the employment of such other means as will serve to relieve the quarantine station and marine hospital from the presence of the nauseating and physically discomforting and annoying odors herein found

to exist and declared to constitute a nuisance at said station and hospital; such injunction to take effect at the expiration of sixty days next ensuing the date of such decree. The court will retain full jurisdiction and control over this cause to the end that it may make any and all such orders and decrees from time to time as shall be necessary for the effectual suppression of such nuisance. Should complaint be made by the government after the expiration of the above mentioned period of sixty days that the operation of the fish factories after that period continues to work a nuisance at the quarantine station, it may be necessary to take further evidence in the case. Such a course is fully warranted by the authorities. The costs of this cause heretofore accrued must be paid by the defendants. A decree in accordance with this opinion may be prepared and submitted.