## ANDREW AND HARRIET GIFFORD v. MARGARET AND EZRA M. HULETT.

### Nuisance; what occupation of a barn will create.

1. The barn of the defendants was situated about thirty feet from the dwelling house of the orators. Horses were kept in it, and manure from them allowed to accumulate within twenty feet of the orators' dwelling. The odor from this was noticeable in the yards and house of the orators, and at times quite offensive. The smell from such accumulations is very offensive to most people, and a continuance of it will in greater or less degree affect the appetite and general health unfavorably. It in part caused the oratrix to be in a feverish and nervous condition; and she was disturbed by the horses and her rest broken thereby. *Held*, that this occupation of the barn constituted a nuisance which should be enjoined.

2. The court considered only those facts as to the use of the barn which existed when the bill was brought.

This was a bill in chancery praying for an injunction to restrain the defendants from maintaining and using their barn on the ground that the same was a nuisance to the petitioners. The case was heard upon bill, answer, master's report and exceptions thereto, at the December Term, 1889. TYLER, Chancellor, sustained the exceptions of the defendants and dismissed the bill. The orators appeal.

The defendants excepted for that the master on the trial before him received evidence of the use and condition of the barn subsequent to the service of the orators' bill; and that the evidence of the orators did not show an existing nuisance at the date of such service.

The bill was served April 24, 1888.

The orators were husband and wife, the wife being the owner of the house which they occupied. The defendants were also husband and wife, the wife owning and the husband using the barn in question, which was a horse barn and situated about thirty feet from the dwelling of the orators. With reference to the use of the barn and its effects upon the orators, the master reported as follows:

Gifford *v.* Hulett.

"The defendant Ezra is a fish peddler, and makes trips to different points, often returning late at night. He had, during the winter of 1887–8, two horses, and a part of the time, three. He commenced keeping his horses in this barn about the middle of November, and they were kept there when not in use, until spring. No other stock was kept in the barn. During the first few weeks the manure was thrown from both stable doors, and what was thrown from the north door was used in banking the barn. After this it was all thrown from the south door, and remained where it was thrown until spring. The pile so made was at the south-east corner of the barn, close to the division line between the parties. A portion of the accumulation was removed early in April. On the 24th day of that month, the day the bill was served, the pile contained about two two-horse wagon loads. The last of the pile was removed on the 9th and 10th days of May. During the summer, the defendant Ezra had two horses, but one was kept in the pasture a part of the time. In the summer the manure was generally taken by wheelbarrow and put in a heap some distance back in the lot. It was sometimes taken directly from the stable, but was at other times suffered to remain at the stable door two or three days. On one occasion in the summer or early fall, it was left there until there was an accumulation of a one-horse wagon load. Later in the fall there was another accumulation somewhat larger, which was there on the 10th day of October, when the defendants were served with notice in proceedings for contempt. During the past winter the defendant Ezra has kept but one horse. The management of the manure was substantially the same as during the previous winter. At the time of the hearing there was no manure at the barn, but it was still used as a horse barn, and was in the same location as when the bill was brought. The horses of the defendant Ezra were fed upon hay and grain. Shavings were used for bedding. The manure was occasionally left in the barn until the second day. There was nothing in the character or management of the accumulations outside the barn to make them more offensive than such accumulations usually are. The winter of 1887–8 was a steady cold one, with frequent falls of snow. I do not see how the manure can have produced any specially disagreeable results before the first warm days of spring. As the weather became warm, and previous to the date of the bill, the heap became unpleasant. The prevailing wind at this point is from the west or south-west. With the wind in this direction,

the odor was noticeable at the house and in the yards of the petitioners, and was sometimes quite offensive. Under some conditions of the weather, during the hot season, the smell from the inside of the barn, when there was no accumulation at the door, was perceptible at the house. Flies were attracted to the vicinity by the barn and its surroundings, and were more numerous at the petitioners' house than they would otherwise have been.

" Several physicians and chemists were used as expert witnesses. I am unable to find from the evidence before me that such an accumulation, so situated, would cause any particular disease at this house. But I find from the evidence that the smell arising from such accumulations is very offensive to the majority of people, and that in the case of a person so affected, a continuance of it would in a greater or less degree unfavorably affect the appetite and general health.

" The petitioners are people about fifty years of age. The wife is a hard working woman, and earns money by laundry work. She is a person of an unusually nervous organization, and more susceptible to disturbance by noise than people in general. The horses of the defendant Ezra stamped and pawed more or less in the night, and the petitioner Harriet was disturbed thereby, and her rest somewhat broken. I do not find that the horses made more noise than is usually made by horses standing in a barn.

" The petitioner Harriet testified that the smell of this manure was very offensive to her, and made her sick at the stomach. On the 16th day of April, 1888, a physician was called to see her, who found her in bed, and in a feverish and nervous condition, and complaining of poor appetite and loss of sleep. He saw her once or twice, and afterwards sent her medicine by her husband. I find that this illness was caused in part by the accumulation of manure above described."

The orators had obtained a temporary injunction, which was as follows :

" Upon reading the foregoing petition in chancery, praying for an order restraining the use of a certain barn therein described as a horse barn 'while remaining in its present location, and for the removal of the same to such distance from the dwelling house of the petitioners as may be hereafter determined by the court. And for the removal of any and all manure

and filth in and on the ground about said barn, to such distance from the dwelling house of the petitioners as may be determined by the court, it is ordered that said defendants, Margaret Hulett and Ezra M. Hulett, and each of them, refrain from using said barn in any manner creating a nuisance to the orators, until the further order of this court."

*C. H. Mason* and *Batchelder & Bates*, for the orators.

Evidence of the condition of things after the service of the bill was properly received to show the continuance of the nuisance. *Truelock* v. *Mertie* (Iowa), 34 N. W. 307.

Upon the facts found by the master the barn as used was a nuisance. *Catlin* v. *Valentine*, 9 Paige, 575; *Baltimore & Potomac R. R. Co.* v. *First Baptist Church*, 108 U. S. 317; *Adams* v. *Michael*, 17 Am. Rep. 516; *Saville* v. *Kilner*, 26 L. T. (N. S.) 277; *Slate* v. *Passon*, 37 Me. 361; *Slate* v. *Kaster*, 35 Iowa; *Babcock* v. *N. J. Stock Yards Co.*, 20 N. J. Eq. 296; *Burclett* v. *Swenson*, 17 Tex. 499; *Kirkman* v. *Handy*, 11 Hump. 406; *Cokes* v. *Birge*, 10 Ga. 336; *Aldrich* v. *Howard*, 8 R. I. 246; Draperys Sperry, 4 L. T. (N. S.) 365; *Pickard* v. *Collins*, 23 Barb. 444; *Hanson* v. *Brooks*, 20 Ga. 537; *Dunsmore* v. *Ry. Co.*, 33 N. W. Rep. 456; *Butterfield* v. *Klaber*, 52 How. (N. Y.) 255; *Davidson* v. *Isham*, 1 Stock (N. J.) 186; *Brill* v. *Flagler*, 23; Wend. 354; *Bishop* v. *Banks*, 33 Conn. 121; *Dargan* v. *Waddell*, 9 Ired. (N. C.) 244; Bado Ray L. R. 8 Ch. App. Cas. 467.

*C. H. Darling*, for the defendants.

The defendants cannot be required to answer anything which arose subsequent to the service of the bill. Such facts can only be brought in by supplemental proceedings. *Hurd and Sewall* v. *Everett*, 1 Pai. Ch. 124; *Downer* v. *Wilson*, 33 Vt. 1; *Blaisdell* v. *Stevens*, 16 Vt. 179; *Birmingham et al.* v. *Lesan*, 77 Me. 494.

If the orators had no cause of action at the time of bringing the original bill they cannot recover in this suit. *Birmingham et al.* v. *Lesan*, supra; *Pinch* v. *Anthony*, 10 Allen, 470; *Milner* v. *Milner*, 2 Edw. 114; *Candler* v. *Pettit*, 1 Paige, 168;

*Jones* v. *Davenport*, (N. J.) 17 Atl. Rep. 570 ; *Bannon* v. *Comegys*, (Md.) 16 Atl. Rep. 129.

They had not. The barn as then constructed and used was not a nuisance. *Curtis* v. *Winslow*, 38 Vt. 690.

The opinion of the court was delivered by

TAFT, J. We consider those facts only which the master reports as existing at the time the bill was served. The exceptions to the report, therefore, become immaterial. The barn was not a nuisance *per se.* Do the facts reported show it was so improperly and negligently used at the time the bill was brought, that such use became and was a nuisance? This must be determined upon the facts found by the master, viz.: Horses were kept in the barn and manure from them thrown out and allowed to accumulate within twenty feet of the orators' dwelling : the manure became unpleasant; the odor was noticeable at the house and in the yards of the orators and was sometimes quite offensive; that the smell from such accumulations is very offensive to a majority of people, and in such cases a continuance of it will, in a greater or less degree, affect the appetite and general health unfavorably; it in part caused the oratrix to be in a feverish and nervous condition, and she was disturbed by the horses and her rest broken thereby.

These facts bring the case within the general definition of a nuisance, which is a term for all practices, avocations, erections, establishments, etc., against which courts will give relief, although they are not intrinsically criminal, because of their tendency to *create annoyance, ill health* or inconvenience. 2 Abb. Law Dic. title, *Nuisance.* Our attention is called to the case of *Curtis* v. *Winslow*, 38 Vt. 690, but in that case the court evidently were of the opinion that the use of the barn was proper and not a nuisance. In this respect all that is stated in the opinion is that the orator's tenants complained of the smell and noise from the defendant's stable, but there was no finding that the complaints were well founded or were true. In the case at bar, the barn could have been so located that no annoyance would

result from its use, with but little more expense than if built in its present location, and nearly as convenient for the defendants; and while a person has a right to do with his own as he pleases, the right is subject to the limitation that he must do it with reference to the comforts and rights of his neighbor; *sic utere tuo ut alienum non lœdas.* The barn can be used for its legitimate purposes so as not to become manifestly and seriously injurious, but we think that it was so improperly and negligently occupied that it became and was a nuisance to the orators; and in respect of the matters complained of and found to be true by the master, they are entitled to the relief afforded them by the temporary injunction, *i. e.,* the barn must not be used in any manner creating a nuisance to the orators, with costs in this court; the costs in the court of chancery to be determined by that court.

*Decree reversed and cause remanded, with mandate.*

MUNSON, J., did not sit, having acted as special master.