JOSIAH O. WOLCOTT, Attorney General of the State of Delaware, on relation of MICHAEL W. MALONEY and EUGENE L. HUSBANDS,

*vs.*

THOMAS E. DOREMUS, President, JAMES S. GRANT, Treasurer, and WILLIAM A. JOSLYN, Secretary, and members respectively of the duPONT TRAPSHOOTING CLUB, an unincorporated association of persons, and upwards of Three Hundred other persons, members of and as said doPONT TRAPSHOOTING CLUB.

*New Castle, April 30, 1917.*

An act interfering with public rights, by affecting public health or safety, or interfering with use of public property, though indictable, may be enjoined as a public nuisance.

That an act may be enjoined as a public nuisance, the evidence must be clear and convincing, and it being conflicting, and injury to the public being doubtful, injunction should not issue.

It is the effect on persons of average sensibilities or animals of normal temperament which determines whether a noise is a public nuisance.

The effect of a noise on a person of average sensibility, necessary to render the noise a public nuisance, must be real, actual, physical discomfort.

Defendants must pay the costs of an action to enjoin a public nuisance, where it existed at the time bill was filed, though abated by their acts before final hearing.

INFORMATION in the nature of an injunction bill to restrain the shooting at targets on the grounds occupied by the DuPont Trapshooting Club. The cause was heard on the information, answer, testimony of witnesses produced before and heard orally by the Chancellor and exhibits. The facts sufficiently appear in the opinion of the Chancellor.

*Robert Penington*, for the relators.
*William S. Hilles* and *J. P. Laffey*, for the defendants.

THE CHANCELLOR. The cause is an information in the nature of a bill filed by the Attorney General on the relation of two citizens to perpetually enjoin the members of a trapshooting club from continuing a public nuisance. After answer filed an application for a preliminary injunction was heard on the information, answer, ex parte affidavits and exhibits. It having been proved that shot from guns used in the trapshooting fell into the public road on which the premises of the club abutted, and that the safety of persons using the highway was seriously endangered thereby, an injunction was awarded enjoining the shooting from all the traps of the club until the further order of the Chancellor. Afterwards the defendants filed a motion to dissolve the preliminary injunction, based largely on allegations that since the granting of the injunction the location of all of the traps and the direction in which the shots were fired were so changed as that it was impossible for shot to reach the highway. Testimony of many witnesses was heard in the cause in January, 1916, and in lieu of oral arguments briefs of counsel were filed March 12, 1917.

In the opinion filed when the preliminary injunction was granted the general facts were fully stated, and it is not necessary to review them here, except as to the new matters shown. It was shown that travelers along the road cannot be struck by shot fired from guns by persons using the traps as now arranged. But these traps were all moved much closer to the public road, and the gunners would now stand in handicap contests at firing points in the traps which are about 45, 55, 105, 165 and 205 feet from the public road. The traps as newly arranged have not in fact been used, the rearrangement thereof being made after the preliminary injunction had been issued against shooting from any of the traps. Under the old location of the traps the one closest to the road was about 183 feet distant therefrom. It is clear, therefore, that danger to the users of the highway from shot from the guns fired from the traps as now located is now eliminated from the case as a ground for relief, but that the traps are all much closer to the road. There was no allegation of disorder, breaches of the peace, or other improprieties at the club.

In order to determine whether a public nuisance will result from a further operation of the club under the changed conditions, two questions of fact must be found as to the effect of noises from the firing of the guns: (1) Whether animals traveling in the public road will be frightened or injuriously affected thereby; and (2) whether the health or comfort of the community has been, or will be, injuriously affected thereby.

The jurisdiction of the court in such cases is not in dispute, and is the same whether the acts complained of are also indictable or not, for the fact that the keeping of a nuisance is a crime does not deprive the Court of Chancery of power to enjoin the nuisance. The same is true whether, or not, it is by statute made a misdemeanor for the club to keep and use the trap-shooting conveniences within 300 yards of the public road. The criminality of the act will neither give nor oust jurisdiction which otherwise attaches. As a general proposition a court of equity cannot enjoin the commission of crime, for its powers relate to civil rights. Where, however, the rights of the public are interfered with, the court has jurisdiction to enjoin the wrongful acts. 4 *Pomeroy on Equity Jurisprudence*, § 1043; 2 *Morawetz on Private Corporations*, §§ 921–923; 1 *Wood on Nuisances*, § 14. The jurisdiction attaches where the public health or safety is affected, or the use of public property interfered with. The use made of their property by persons owning land abutting a highway may be a public nuisance if the highway be made unsafe for travel thereon, and a Court of Chancery will prevent the injury though it cannot punish the offender. In two Delaware cases the power of the Court of Chancery to enjoin as a public nuisance an act interfering with public rights was recognized, though not applied. *Harlan, etc., Co. v. Paschall*, 5 *Del. Ch.* 435, 470; *Gray, Atty. Gen., v. Baynard*, 5 *Del. Ch.* 499. In *Murden v. Lewes*, 6 *Boyce* 48, 96 *Atl.* 506, which concerned a physical obstruction of a highway, it was said that "a nuisance is public when it affects rights to which every citizen is entitled," and it follows, of course, that a nuisance which affects the right of travelers on a public highway, or the health of the community is a public nuisance. *Joyce on Nuisance*, § 5, *p.* 11. To give the Court of Chancery jurisdiction to enjoin

a public nuisance, the evidence must be clear and convincing. If the evidence is conflicting and the injury to the public is doubtful, the Chancellor should not act. 4 *Pomeroy on Equity Jurisprudence*, § 1439; *Harlan, etc., Co. v. Paschall*, 5 *Del. Ch.* 435, 470. Each case presented to the court must be tested by its own circumstances. *Gray v. Baynard, supra.*

Of course, noises alone may constitute a nuisance. Whether a particular kind or volume of noise in a particular locality is, or is not, a public nuisance, depends upon the effect thereof on persons of normal nerves and sensibilities, and of ordinary tastes, habits and modes of living, and not on persons who are delicate bodily and abnormally nervous, or ill. The effect produced must be an actual physical discomfort produced upon a person of average sensibilities. These principles are so well established and so reasonable that it is not deemed necessary to cite authorities on the point. Indeed, the solicitor for the relators in his brief does not dispute the principle, and makes as the test of liability a substantial discomfort to persons of ordinary sensibilities. So, also, to render the highway unsafe the effect of noises on horses, or other animals passing along the highway, must be such as to injure or frighten a horse of normal temperament, or as is frequently held, horses of "ordinary gentleness." *Joyce on Nuisances*, § 256; *Wood on Nuisances*, *p.* 402; *Wabash, etc., Co. v. Farver*, 111 *Ind.* 195, 12 *N. E.* 296, 297, 60 *Am. Rep.* 696; *Stone v. Langworthy*, 20 *R. I.* 602, 40 *Atl.* 832, 833; *Patton, etc., Co. v. Drennon*, 104 *Tex.* 62, 133 *S. W.* 871.

The character of the noises will not be altered by moving the traps closer to the public road. As to the character of the noises it was shown that the club had a large membership; was used not only by members but also by visitors who were made welcome; and the traps were used for large tournaments, which lasted several days. It was claimed for it that the club was, or would be made, very prominent in that kind of sport, and was in fact the largest of its kind in the world. On some days at least 5,000 shots were fired. In one year 250,000 targets were used on 104 days of shooting. The effect of from 10 to 25 persons shooting together, though not simultaneously, was

described as a fusillade of explosive noises, as a bombardment, and the like.

Has the highway been rendered unsafe because noises from the firing of the guns will frighten or injuriously affect the horses and other animals being used by travelers on it? There was evidence that certain horses passing along the highway while trapshooting was in progress at the traps as originally arranged were in fact frightened, and at least one became uncontrollable and ran away. But it was not clear in all cases that horses were actually struck by shot and so were not frightened by the noises only, and the fair inference from the testimony is that they were hit by shot. The effect of moving the traps nearer to the public road has not been tried. Of course the character of the noise was not altered by the change of location of the traps. It is clear, however, that the volume would be greatly increased by the use of all traps so much closer to the road.

The testimony, both theoretical and experimental, as to the effect of the peculiar noises made by the trapshooting on the premises is conflicting in some respects. With respect to almost every horse which has been struck by shot, it is clear that no injury would be done to it. An animal would ordinarily be made what is called "gun shy," or peculiarly nervous on hearing a similar sound elsewhere, and by associating the occurrence with the place would be made especially nervous in the same locality. But this special objection does not now exist, for by the new arrangement of the traps shot cannot reach the public road. Almost all of the cases where according to the testimony horses have been frightened to such an extent as to cause them to get beyond control were those where the animals were struck by shot, or were temperamentally abnormally nervous.

It has been difficult to determine the effect of the noises only on horses in the road. The opinions of expert and other witnesses vary greatly. One thing is quite certain; the movement of the traps closer to the road will increase the probability of injurious effect on animals in the road. While the weight of testimony of persons of experience with horses was that the peculiar noises made by trasphooters on the premises of the

club were such as to alarm and frighten normally tempered horses, and to that extent injure them and increase the danger to their drivers; still inasmuch as there was reliable testimony to the contrary, and there was an absence of testimony that any normally tempered horse had been so affected by the noises only during the period of five years in which the shooting was done, it does not seem just or equitable, or within the limitations of the discretion of this court, to prohibit all shooting on the premises of the club. The evidence of the State is not "clear and convincing," as is required and is in fact conflicting. In case of serious doubt arising from conflicting testimony, the court should leave the matter to be settled by another tribunal, where the fact of the injury to the public rights could be ascertained by a jury. Inasmuch, then, as the evidence on this point is really conflicting and the injury to the public doubtful, that alone constitutes here a proper ground for withholding the interposition of the extraordinary power of this court asked for.

Has the health or comfort of the community been really affected by the noises made by the club? Without reviewing the testimony it is clear that it was not shown either theoretically by experts, or practically by particular instances, that actual physical discomfort was produced upon persons of normal health and sensibilities. The disturbance of the rest of two normally healthy night workers in the community does not justify the relief sought. The testimony of the complainants on this branch of the case does not come up to the requirements to obtain injunctive relief, and there were many witnesses living in the vicinity who testified to the absence of material annoyance by the day shooting. In this connection it should be noted that an entirely different problem would probably arise in case the practice of shooting at night was resumed. But inasmuch as the practice had ceased at the time the information was filed, it cannot now be a ground for present relief.

Upon neither of the two grounds, therefore, should the court by injunction prevent the use of the premises by the club for the purpose of shooting at targets from the traps as now arranged.

Inasmuch, however, as there was ample evidence that at the time the bill was filed the shot fired by gunners from the traps fell into the public road, rendering it unsafe to travelers using it, and a public nuisance was thereby created, the defendants must pay all the costs of the cause.

Let a decree be entered accordingly.