DAVID J. CAIN, BETTY A. CAIN, JACK M. CHRISTMAN, DORO-THY E. CHRISTMAN, HUGH W. GRAY, ELINOR H. GRAY, FREDERICK R. GOODING, CHARLOTTE G. GOODING, ERWIN A. LAUER, MADELEINE D. LAUER, CHARLES J. MIGHTON, FRANCES K. MIGHTON, WILLIAM H. ROBERTS, ALISON RUSH ROBERTS, JOHN R. WILLIAMS, FRANCES S. WIL-LIAMS, LOVELL WILLIS and JANET T. WILLIS,

*vs.*

DOMENICO ROGGERO, MARIA C. ROGGERO, LORENZO ANSELMI, SETTIMIO CASTORANI, LORENZO TOSELLI and PIETRO TOSELLI.

*New Castle, July 28, 1944.*

*William H. Foulk* and *Arthur G. Connolly,* for complainants.

*W. Thomas Knowles* and *Bayard W. Allmond,* for defendants.

PEARSON, Vice-Chancellor: Complainants are residents of Westhaven, a real estate development in Christiana Hundred, located west of a portion of the westerly boundary line of the City of Wilmington. Defendants are the owners and operators of eight mushroom houses on a tract adjoining Westhaven on the west. During the summer, defendants store some 360 tons of horse manure, exposed to the weath-

er, on the land between the mushroom houses and the division line of Westhaven. Complainants say that it gives off an extremely noisome and offensive stench or odor, contaminating the air which permeates the homes of complainants and other residents of the neighborhood; that flies germinate in large numbers and swarm around complainants' properties and enter their homes; and as a result, the occupancy of their homes by complainants and their families is made uncomfortable, sickening, and unbearable. Complainants pray that defendants be enjoined from maintaining manure in exposed piles and from operating the mushroom houses in such manner as will interfere with the comfort and well-being of complainants.

In 1928, the defendant Roggero and others purchased their tract, and in July, started to build mushroom houses. The total cost amounted to $15,500. They have operated the houses since that time. The adjoining land, which now constitutes Westhaven, was then, for the most part, an open field. Some years later, the development was begun, and there are now more than forty houses erected on the tract. These were purchased at prices ranging from $9,000 to $14,000, and represent a total investment of about $400,000.

Du Pont Road extends north and south, approximately parallel with the easterly boundary line of Westhaven, and separated from it by a half dozen lots facing on the road, of an average depth of about 150 feet. On the easterly side of du Pont Road (opposite the easterly line of Westhaven), there is now another real estate development known as Westmoreland. It is located on land which was also vacant when the mushroom operations were begun. Adjoining the Westhaven tract on the north is a development of expensive homes, known as Westover Hills. This latter development was begun prior to 1928, but it does not appear how near it was built up to the Westhaven tract at that time. The southwest corner of Westhaven is practically adjacent to

the right of way of the Landenburg branch of the Reading Railroad. Measuring between nearest points, Westhaven is about 1,600 feet from some large greenhouses; about 500 feet from one cemetery and 1,600 feet from another; about 700 feet from an arm of a flying field; about 2,400 feet from mushroom houses operated by persons not involved in this proceeding; and about 1,000 feet from a tap room at the corner of Lancaster Pike and du Pont Road.

Defendants' practice is to haul manure to their tract during the early summer. In 1942, they began on May 27; and in 1943, on July 15. They store it in large piles, in an area in front of the mushroom houses. About 45 tons are required for each of the eight houses. When first acquired, the manure contains many materials, including ammonia, which would be toxic to mushrooms, and hence, must be subjected to a decomposition process to break down and convert these materials into non-toxic substances. This is accomplished by "turning" the piles, that is, digging into them with a fork, shaking each forkful, repiling the manure, and adding water. One of the defendants said it takes him two days to turn a single pile of 45 tons. The piles are "turned" three or four times at intervals of about a week between each turning. A month after the first turning, the manure is suitable for growing mushrooms, and is then transported into a mushroom house to be so utilized. After the manure is brought to the tract, it is allowed to stand undisturbed until a month before it is to be taken into a mushroom house. Defendants stagger the crops of mushrooms. They fill one house at a time, beginning in late August or early September, and continuing until all of the houses are filled, about the first of November. Thus, the turning process is begun early in August.

One side of the area where the manure is piled is approximately parallel with the westerly division line of Westhaven, and 35 feet distant from the line. Complainants'

nine homes are at varying distances from this area, the nearest house being 60 feet distant; the farthest 850 feet; and all but two are within 250 feet.

A number of complainants and other residents testified that while the manure is stored and being processed, they are annoyed and disturbed in their homes and yards by an offensive odor and by an excessive number of flies. Some stated that the stench compelled them to close windows in their houses on hot days and nights; that at times they were unable to use their yards or porches; that their sleep was disturbed either by the odor or by the heat when the windows were closed; that it affected their appetites; that they were embarrassed when entertaining guests; and that the odor was obnoxious and unbearable. As to the flies, there is testimony that many of the complainants noticed an abnormal number when the manure was present, and particularly when it was turned. A sanitation engineer for the State of Delaware said that he found evidence of extensive fly breeding in the manure. Various witnesses testified that in spite of screening and other measures, large numbers of flies entered their homes, and were generally annoying, inside and out. The evidence shows that the complainants who lived nearest the manure piles were almost continuously annoyed by the odor and flies, while the piles were exposed. Those at some distance, or separated from the piles by other dwellings, testified to intermittent annoyance, several times a week, or a month, when the wind was blowing in a direction from the piles.

Defendants produced as witnesses various residents of Westhaven who testified that they were not disturbed by any odor from the manure, and that they had not observed an excessive number of flies about their homes. All but one, however, had noticed the odor at various times. None of the witnesses lived nearer than 300 feet from the manure pile area. Other witnesses, not residents of Westhaven, testified with respect to the odor of manure, and fly breed-

ing in manure, generally. Their testimony was to the effect that horse manure has little, if any, odor observable at a distance of more than a few feet from the piles, or that the odor is only noticeable for short periods when the manure is first piled, and when it is turned; that the odor diminishes as a result of each turning, and when put into the mushroom houses, it has no odor whatever; that heat is generated within the manure piles so that fly breeding is .prevented in all but a thin layer; and that witnesses who had observed other such piles had not found flies in unusual numbers. Defendants insist that any annoyance to complainants because of the manure piles is trifling and inconsequential; that complainants' witnesses were exaggerating the actual condition, or were overly fastidious, and not of normal sensibilities; that there has been no showing of depreciation in the value of complainants' lands; and that their actions indicate that they are not suffering serious physical discomfort so as to warrant the issuance of an injunction.

After considering the evidence, I conclude that the testimony of complainants and their witnesses has not been discredited. In the light of common knowledge and experience, it does not seem an indication of abnormal sensibilities that complainants should detect a strong odor from the large quantities of manure, under the conditions admittedly existing, or that they should evaluate that odor as objectionable when it permeated their homes. The facts support a finding that the complainants who testified were persons of normal sensibilities, tastes, and habits; and that the odor from the manure produced actual physical discomfort to them. It is plain that at least those complainants who live within 250 feet of the piles were visited by a large and unusual number of flies. To infer a casual connection between the presence of manure and the great number of flies is justifiable in view of the evidence of the existence of fly larvae in the piles, and other testimony. It is reasonable to believe that these complainants were annoyed by the flies

and that, coupled with the disagreeable odor, the flies were an aggravating discomfort.

An otherwise lawful business or activity which causes the emission of noxious or offensive smells to such an extent as substantially to impair the reasonable comfort and enjoyment of adjacent occupants, may constitute a nuisance and be prohibited by injunction. *United States v. Luce (C. C.)*, 141 *F.* 385; *State v. Wetherall & Dunsey,* 5 *Hart,* 487; *State v. Luce, et al.*, 9 *Houst.* 396, 32 *A.* 1076; *Benton v. Kernan*, 127 *N. J. Eq.* 434, 13 *A.* 2d 825; 39 *Am. Jur. pp.* 335, 336, 341, 342. In the following cases, the odor of quantities of horse manure was held sufficiently offensive and annoying to residents of areas contaminated to warrant an injunction to prevent the activities which occasioned it: *Rowland v. New York Stable Manure Co.*, 88 *N. J. Eq.* 168, 101 *A.* 521; *Gifford v. Hulett*, 62 *Vt.* 342, 19 *A.* 230.

As to the fact that defendants had operated the mushroom houses for more than twelve years before complainants' homes were built, the rule stated in *United States v. Luce,* (*C. C.*), 141 *F.* 385, 410, 411, will be adopted: "the mere fact that one voluntarily 'comes to a nuisance' will not preclude him from complaining of and obtaining relief against it." Defendants urge that the general character of the locality was that of an agricultural and semi-industrial area, and that complainants must accept and submit to annoyances which are usually experienced in like areas. When defendants established their business, the locality was on the periphery of residential areas. At the present time, Westhaven is unquestionably a residential locality and suitable for that use. No activity in the neighborhood, other than that of defendants, causes disagreeable odors in anywise comparable to those coming from the manure piles. In the *Luce* case, the court said:

"Where one operates a factory emitting foul or noisome smells, and owns and controls all the land within the area traversed by them

in sufficient strength to be nauseating or substantially discomforting and annoying, no one has just cause of complaint. But to foist impure and disgusting odors upon others in their homes is a different matter, and save in localities generally devoted to business of a character to produce such or equally offensive smells, or unless by virtue of grant, license, estoppel or prescription, is not to be tolerated."

Following the reasoning of that case, the earlier establishment of defendants' activities could not prevent the owners of the adjacent land "within the sphere of the noisome odors from building and occupying dwelling houses thereon, nor deprive them of the right to have and enjoy reasonably pure and inoffensive air in and about their homes."

I find no merit in defendants' argument that by virtue of a deed relocating a right of way, complainants' predecessor in title acquiesced in, or licensed, defendants' use of their land for the storage of manure.

Defendants earnestly contend that in order for an injunction to issue, complainants must sustain a heavy burden of establishing their case by clear and convincing proof, particularly since there has been no trial of the fact of a nuisance at law. *Finch v. Barr & Dougherty, Inc.*, 15 *Del. Ch.* 170, 132 *A.* 889; *Wolcott, Attorney-General v. Doremus*, 11 *Del. Ch.* 277, 101 *A.* 868. This proposition is recognized; and complainants have met the burden. The storing and processing of manure at the location and at the time of year which defendants have chosen in the past should be enjoined. If they are able to change the time or place of storing the manure, or otherwise alter their operations so as to avoid the objectionable consequences existing in the past, they will be at liberty to do so.

A decree accordingly will be advised.